## PARK, Treasurer, *v.* CANDLER, Governor.

The mandate of the constitution, embraced in that paragraph thereof which declares that the proceeds arising from the sale of the public property owned by the State shall be applied to the payment of the bonded debt of the State, and used for no other purpose whatever, is fully met when such proceeds are devoted to the payment of the interest on the public debt; because the interest contracted to be paid is as much a part of that debt as the principal named in the bond.

FISH and COBB, JJ., dissenting. 1. In interpreting the provisions of a constitution it is to be presumed that the words therein used were employed in their natural and ordinary meaning; and where a word has a technical as well as a popular meaning, the courts will generally accord to it its popular signification, unless the nature of the subject indicates, or the context suggests, that it is used in a technical sense.

2. Constitutions are the result of popular will, and their words are to be understood ordinarily in the sense that such words convey to the popular mind.

3. A constitution is to be considered as a whole, and effect is to be given, if possible, to each section, clause, and word; and if the language of any part be doubtful, it must be interpreted by every fair intendment to harmonize with the main purpose, and not to defeat it.

4. The presumption is that the same meaning attaches to a given word or phrase wherever it occurs in a constitution; and where a word or phrase is used in one part of a constitution in a plain and manifest sense, it is to receive the same interpretation when used in every other part, unless it manifestly appears, from the context or otherwise, that a different meaning should be applied to it.

5. In interpreting a provision in a constitution, the meaning of which is doubtful or ambiguous, the courts, in endeavoring to arrive at the intention of the people, will consider the object sought to be accomplished and the mischief sought to be remedied by the provision, and to this end will deal with the provision in the light of prior or contemporaneous history and the conditions and circumstances under which the constitution was framed.

6. The proceedings and debates of a constitutional convention, while powerless to vary the terms of the constitution, are nevertheless valuable aids in determining the purpose and consequent meaning of a doubtful provision.

7. The power of legislation may be taken away from the lawmaking power by the constitution as well by implication as by express prohibition, and prohibitions against legislation which result by implication are equally as effectual as when they are express, and are to be regarded in the one case no less than in the other.

8. When all of the provisions of a constitution on a given subject disclose a plan for the regulation of the finances of the State, it is necessarily implied from the instrument that the General Assembly should not pass any law which would have the effect of destroying such plan.

9. While legislative and executive construction of a constitution, as fixed by a long-continued and unbroken exercise of a given power claimed to be authorized by the constitution, is a weighty argument in favor of the constitutionality of such exercise of authority, a single exercise of power either by the

legislative or executive department in a long period of years is entitled to little or no weight when the question is before the courts for the first time, and no rights of any one interested in the case in hand have vested under such exercise of authority.

10. An interpretation of a constitutional provision by the General Assembly, in order to be entitled to weight as contemporary interpretation, must be the result of legislation passed very near the time that the constitution was adopted, and legislation passed nearly five years after the adoption of the constitution is not entitled to be ranked as contemporary interpretation of the constitution by the General Assembly in the sense of the rule just referred to.

11. A doubt as to the constitutionality of any proposed legislative enactment should in any case be reason sufficient for refusing to adopt it.

12. Generally there is a presumption from the mere passage of an act or resolution by the General Assembly that the members of that body have deliberately passed upon the question of the constitutionality of the act or resolution ; and as a result of this presumption the courts, in case of doubt as to the constitutionality of the legislation, will hold the same to be constitutional, thus according to the members of the legislative department due credit for having deliberately and conscientiously passed upon the question, and giving to the legislation the weight which it should receive as the result of a deliberate and conscientious exercise of authority by the members of the legislative department of the government, who are equally bound with the members of the judicial department to support the constitution.

13. Quære : Where it appears upon the face of an act or resolution that the General Assembly has not attempted to pass upon the constitutionality of the legislation therein provided, and that it is the manifest purpose of the act or resolution that it shall not go into effect until the courts shall determine that it is not repugnant to the constitution, is there any presumption at all in favor of the constitutionality of such an act or resolution ?

14. The argument ab inconvenienti should not, as a general rule, be resorted to in interpreting the provisions of a constitution ; and especially should the argument from inconvenience not be at all considered when the lawmaking power under the constitution had ample authority, not only to prevent the inconvenience complained of, but also to remedy it after it had arisen, in a manner other than that contemplated in the act or resolution under consideration, even if it be regarded as of doubtful constitutionality.

15. The expression "bonded debt" of a corporation, State, etc., in a strictly legal and technical sense, embraces both the principal and interest that may accrue upon a debt of that class.

16. Such expression in its popular sense embraces only the principal of the debt.

17. The term "bonded debt," as used in paragraph 1, section 13, article 7 of the constitution (Civil Code, §5900), which provides that the proceeds of the sale of public property shall be applied to the payment of the bonded debt of the State, and shall not be used for any other purpose whatever, so long as the State has any existing bonded debt, was used in its popular and not in its strictly legal and technical sense.

18. There is no mandatory requirement in the constitution that the interest on the public debt shall be raised by taxation, if there is revenue from any source which may be applied to the payment of such interest consistently with the constitution. The constitution, art. 7, sec. 14, par. 1 (Civil Code, § 5901), requires only that the General Assembly shall each year raise by taxation such

an amount as may be required to pay the public expenses and interest on the public debt; and if there is any fund from which either the public expenses or the interest on the public debt may be constitutionally paid, the sum required to be raised by taxation would be only the difference between the amount of public expenses or interest on the public debt and the fund constitutionally available to discharge these items; and if there is a fund constitutionally available for this purpose which will pay such items in full, then no sum is required to be raised by taxation.

19. When all of the provisions of the constitution in reference to the public debt are taken together, and especially when such provisions are taken in the light of the proceedings of and debates in the convention which framed the constitution, it is clearly derivable from the terms of that instrument that it was the purpose of its framers to provide a plan whereby the State would, at some time in the future, be entirely relieved of debt, and this plan was to be effectuated by raising such sum annually by taxation as was necessary to pay the interest of the public debt each year, and the principal was to be discharged by a sinking fund made up of installments of a given amount raised each year by taxation, and the proceeds of the sale of any public property that the General Assembly might authorize to be sold ; and if the sinking fund and the proceeds of the sale of public property together were not sufficient to discharge the entire principal at the maturity of the debt, such additional amount as was necessary for this purpose was to be raised by taxation.

20. The scheme provided in the constitution for the final redemption of the State from a condition of indebtedness was intended to be carried out in such a way that there would not be, in any given year or series of years, any burdensome tax levy to meet the principal of the public debt or any part thereof.

21. Quære : The constitution declaring that the proceeds of the sale of public property shall be applied to the payment of the bonded debt of the State, is not authority thus conferred upon the General Assembly to use the proceeds of the sale referred to, in the extinguishment of the bonded debt, by the purchase of any outstanding unmatured bonds of the State, either at par, below par, or at a premium, whenever the General Assembly may deem it wise to so use this fund ?

22. The proceeds of the sale of public property referred to in the constitution, art. 7, sec. 13, par. 1 (Civil Code, § 5900), can not be constitutionally applied to the payment of the current interest on the bonded debt, when at the time of such payment no part of the principal is discharged.

23. The above proposition is true whether the paragraph of the constitution above cited be considered alone, or in connection with other provisions in the constitution, or in the light of public history and the proceedings of and debates in the convention that adopted the constitution.

Argued December 20, 1901. — Decided January 4, 1902.

Mandamus.    Before Judge Candler.    Fulton superior court. December 17, 1901.

*Logan E. Bleckley* and *Orville A. Park,* for plaintiff in error.
*Joseph M. Terrell, attorney-general,* contra.

LITTLE, J.    The treasurer of the State of Georgia excepted to, assigned as error, and has brought to this court for review, a ruling

made by Judge Candler of the Stone Mountain circuit, by which a writ of mandamus, on application of the Governor, was ordered to be issued to compel a transfer, to the credit of the fund available for the payment of interest falling due on the bonded debt of the State, of a named amount of money now in the State treasury which arose from the sale of property belonging to the State. The General Assembly, by a resolution which was approved by the Governor, directed the transfer to be made, so that, to the extent of the sum designated, the fund should be made available in payment of current interest on bonds the principal of which will not mature in a number of years. We find, in the briefs of counsel for the plaintiff in error, questions pertaining to the form and character of the resolution which was passed, made as a consistent part of their contention that the resolution does not have the legal effect to compel the transfer. However, it is our opinion, that under a proper construction of the resolution on which the application for mandamus was based, the main and controlling question — that is, whether the proceeds of the sale of public property can legally be applied to the payment of current interest on the bonded debt, before maturity of the principal — is made, and can be properly decided under the pleadings and the admitted facts. We comply, therefore, with the request made by the attorney-general, who appeared for the Governor, and in which, as we understand, counsel for the plaintiff in error joined, and deal with the case on its merits. Inasmuch as the question at issue is one purely of law, affects alone the public interest, and must depend for a solution on an interpretation of a part of the constitution with which all of us have been more or less familiar for years, it is not unnatural that those who are called to pass upon it in their capacity as citizens may personally entertain decided views in relation to the expediency and policy of the legislation enacted. That fact, however, affords no reason why the judgment to be rendered should reflect the individual opinion, in this regard, of those who pass upon it; for, as Judge Cooley observes in his work on Constitutional Limitations (p. 168): "The courts are not the guardians of the rights of the people of the State, except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The protection against unwise or oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of

the people. If this fail, the people in their sovereign capacity can correct the evil; but courts can not assume their rights. The judiciary can only arrest the execution of a statute when it conflicts with the constitution. It can not run a race of opinions upon points of right, reason, and expediency, with the lawmaking power."

The resolution which it is claimed is in contravention of the limitation which the constitution has placed on the power of the General Assembly to deal with the public-property fund, after reciting that a named amount arising from the sale of property of the State is in the State treasury, and that none of the principal of the bonded debt of the State will be due until January 1, 1915, proceeds as follows: "Resolved further, that the sum of three hundred and twenty-five thousand, eight hundred, and eighty dollars, arising from the sale of public property shall be by the treasurer of this State transferred, within one day after the approval of this resolution, from the public-property fund to the interest fund, and the same shall be paid out by the treasurer on such interest on the recognized, valid bonded debt of the State as may mature in the year 1902, in accordance with a general appropriation act approved December 21, 1900, and the treasurer is hereby authorized and directed to make such transfer and payment," etc. We deem it entirely appropriate, before undertaking to consider the merits of the question presented, to inquire as to the circumstances under which an act of the General Assembly, a co-ordinate branch of the State government, will be pronounced invalid by the judiciary because of a supposed conflict between the terms of the act and the provisions of the organic law. It must be conceded that the lawmaking power, within its proper sphere, is supreme, and entirely independent of the judiciary. The latter is bound by the enactments of the former, and must bow to its will, when expressed in the manner contemplated by the law. To say that a State legislature can not enact particular legislation, or legislate on a particular subject, is to deny a right of legislation to the people, from whom alone the constitution received its sanctity. For, as said by Judge Cooley, "In creating a legislative department and conferring upon it legislative power, the people must be understood to have conferred the full and complete power as it rests in, and may be exercised by, the sovereign power of any country, subject only to such restrictions as they may have seen fit to impose, and to the limitations which are contained in the consti-

tution of the United States." Con. Lim. p. 87. This court, in the case of *Allison* v. *Thomas*, 44 *Ga.* 649, but gave expression to a well-recognized rule when it said: "Every presumption will be made in favor of the constitutionality of an act of the State legislature." And in the case of *Churchill* v. *Walker*, 68 *Ga.* 681, it gave recognition to another important principle in State government when it declared: "The legislature has power to pass all acts not forbidden by or obnoxious to the constitution, and the presumption is in favor of the constitutionality of such acts until they are clearly shown to be unconstitutional." One reason why legislative acts are presumed to be in harmony with the organic law is, that the individuals composing the lawmaking power are as much under an obligation, not only to support but to obey the mandate of the constitution, as the judicial officer who is called on to interpret their action. The fact that the legislation was enacted by the lawmaking power and that it received the approval of the executive, must necessarily be taken as an expression of these two branches of the government that such enactment is within the constitutional limits prescribed for the lawmakers; and this is so even when provision is simultaneously made that the question of the correctness of their views may be submitted to the judiciary for authoritative determination. That this has been done in the present case does not alter the fact that the legislation enacted was the expression of their will under their obligation to confine their acts to the requirements of the constitution as they understand it.

The solemn act of one co-ordinate branch of the government, the lawmaking power, may not lightly be set aside, nor will it be declared void unless it clearly appears that the act in question is violative of some provision of the organic law, which the people, looking to their own protection, or as expressive of a declared policy, have solemnly adopted. Chief Justice Marshall, in the case of Fletcher *v.* Peck, 6 Cranch, 128 (cited by Judge Cooley), said: "The question whether a law be void for its repugnancy to the constitution is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station could it be unmindful of the solemn obligation which that station imposes. But it is not on slight implication, and vague conjecture, that the legislature is to be pronounced

to have transcended its powers and its acts to be considered as void. The conflict between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other." Mr. Justice Washington in Ogden *v.* Sanders, 12 Wheat. 270 (also cited by Judge Cooley), states the reason for the rule in the following language: "It is but a decent respect due to the wisdom, integrity, and the patriotism of the legislative body by which any law has been passed, to presume in favor of its validity until its violation of the constitution is proved beyond reasonable doubt." However, it is not necessary to go beyond the decisions of our own court to support what seems, and ought to be, an important rule binding on the judiciary in considering the validity of an act of the legislature. It was ruled in the case of *Carey* v. *Giles,* 9 *Ga.* 253, that "Acts of a legislature constitutionally organized are to be presumed to be constitutional, and it is only when they *manifestly* infringe some of the provisions of the constitution, or violate the rights of the citizen, that their operations should be impeded by judicial power," and that "A solemn act of the government will not be set aside by the court in a doubtful case. The incompatibility or repugnancy between the statute and the constitution, must be clear and palpable." In the case of *Turman* v. *Cargill,* 54 *Ga.* 664, Judge Jackson, who delivered the opinion of the court, after admitting that the Judges entertained doubts as to the constitutionality of an act of the legislature, which was in question, said, in pronouncing the act constitutional, that, "Before an act of the General Assembly of the State, assented to by the executive, is declared null and void, the judicial branch of the government should be clearly satisfied. If it be at all doubtful, the doubt most assuredly should turn the scale in favor of the construction which the two other branches of our State government have given to the constitution." To the same effect, see *Thompson* v. *Spraigue,* 69 *Ga.* 420; *Wellborn* v. *Estes,* 70 *Ga.* 390; *Scoville* v. *Calhoun,* 76 *Ga.* 263.

Again, courts are not at liberty to declare an act void because, in their opinion, it is opposed to a *spirit* supposed to pervade the constitution, but not expressed in words. "When the fundamental law has not limited, either in terms or by necessary implication, the general powers conferred upon the legislature, we can not declare a limitation under the notion of having discovered something in the *spirit* of the constitution which is not even mentioned in the instrument." Cooley's Con. Lim. 171.

Recognizing, then, that acts of the legislature are to be presumed to be in harmony with the organic law, that they are not to be declared inoperative because of an idea that the spirit of the whole instrument requires a particular construction of ordinary language in the absence of words expressive of such intent, that a legislative act can not be declared void unless its conflict with the constitution can be pointed out, and that such conflict must be manifest, plain and palpable, we shall endeavor to show that neither by express words nor by necessary implication does the constitution forbid the application of the proceeds of the sale of public property to the payment of current interest on the bonded debt of the State, in advance of the maturity of the principal, but that the same, by a proper act of the legislature, can lawfully be done. The constitution, art. 7, sec. 13, par. 1, in directing what disposition shall be made of such proceeds, declares that, "Whenever the General Assembly may authorize the sale of the whole or any part thereof, [the proceeds] shall be applied to the payment of the bonded debt of the State, and shall not be used for any other purpose whatever, so long as the State has any existing bonded debt." An attempt to use this fund temporarily, in payment of appropriations made for the support of public schools, brought from this court, in the case of *Park* v. *Candler*, 113 *Ga.* 647, a ruling that such use would be illegal, and that the fund referred to could only be used in payment of the bonded debt. But the ruling then made did not involve the question whether it was lawful to use that fund in payment of the interest as well as the principal of that debt, that question not having been involved in the case presented. Whether this can be done depends upon the definition to be given to the term "bonded debt," as used in this paragraph of the constitution. There can be no question that when these words are taken in their ordinary sense they refer to that indebtedness of the State which has been created by contract in the form of a bond, that is a written obligation and promise to pay to the holder of the writing a named amount of money at a given time, *together* with interest at a stated rate per cent. In the case of the *City Council of Dawson* v. *Dawson Waterworks Co.*, 106 *Ga.* 710, Mr. Justice Cobb, who delivered the opinion, defines the word "debt" so as to include any obligation that one is under to another to pay money or other thing of value, which arises the very moment that the ob-

ligation is undertaken and continues until discharged by payment; and a "bonded debt" is defined by some lexicographers to be that part of the entire indebtedness of a corporation or State which is represented by bonds it has issued, as distinguished from a floating debt; by others it is declared that a "bonded debt" is a debt contracted under the obligation of a bond. It is the form of the obligation which gives character to this class of debts and distinguishes it, but it is not the form which serves to determine the amount and extent of the obligation. That must be ascertained from the terms of the contract as written; and when ascertained, the bonded indebtedness, or indebtedness by bond, is shown. Such indebtedness may or may not consist of two integral parts—principal and interest. Whether it does or does not depends on the nature of the obligation. If by its terms a promise is made that the maker will pay to the holder a particular amount at a named day, and in addition thereto interest on such amount at a given rate per cent. at particular times, then the bond binds the maker equally to pay both, and the obligation is not discharged when he complies with one of its terms and fails to perform the other. Not only so, but the promise to do one of these things is just as binding as the promise to do the other. Each is an indebtedness distinct from the other, created by the same obligation—the bond,—and the aggregate of the two constitutes the sum of the indebtedness. Where the maker is subject to a civil action, the production of the bond gives the right of recovery for accrued and unpaid interest which may be due according to its terms. It can do no more as to the principal. It was provided by the Code of 1882, § 4601, that when a fine was imposed for a violation of a certain class of criminal offenses (selling property which was under a mortgage), one half of the fine imposed should be paid to the holder of the mortgage (the person injured), and the payment should extinguish the *debt* to secure which the mortgage was executed, etc. This court ruled in the case of *Conley* v. *Maher*, 93 *Ga.* 781, in construing that statute, that the term "debt" embraced interest as well as principal. That the interest contracted to be paid by a bond is a part and parcel of the bond, see 9 Wall. 483–4; 14 Wall. 282.

The constitution, a provision of which we are considering, declares, in article 7, section 1, paragraph 1, that the powers of taxation in this State shall only be exercised by the General Assem-

bly for named purposes. , Among these are, "to pay the interest on the public debt; to pay the principal of the public debt." It would therefore seem that the public debt—that is the bonded debt—is composed not only of the principal, but also of the interest contracted to be paid. The term "bonded debt," in its real as well as in the ordinary and generally accepted sense of the phrase, means not only the principal amount named in the bond, but also the sum of the interest which in the obligation is promised to be paid. If, however, it be admitted—and we think it ought to be —that the term "bonded debt" is not in every instance used to express the amount of both principal and interest, but sometimes to express the principal named, yet, if these words are in any case to be given that meaning, it must be so because of the context with which they are used, or from circumstances which show that the meaning of the phrase is to be restricted. Inasmuch as the term generally and naturally includes the interest, the intent to restrict the meaning must be made to appear when they are used to express separately the principal of the debt before it should or can properly be done. In this particular case it must be remembered that we are considering words used by the framers of a constitution. To them credit must not only be given for care in the use of language, but also of a full knowledge of the proper and correct meaning of the words which they employed. In so doing, we are bound to conclude, in the absence of words limiting the meaning of the phrase used, that a fair and natural interpretation of the constitutional provision referred to, standing alone, is that the proceeds of the sale of property belonging to the State may lawfully be applied to the payment of the principal and interest, as well as to the principal or interest on the bonds of the State.

But it is urged that paragraph 1, section 12 of this same article, also uses the term " bonded debt," and in such a connection that it must refer alone to the principal of the bonds; and it is argued, inasmuch as the same term is used in the paragraph under consideration, that it was therefore the intention of the framers of the constitution that the words there used should likewise only refer to the principal of the bonds. The paragraph so designated reads as follows: " The bonded debt of the State shall never be increased, except to repel invasion, suppress insurrection, or defend the State in time of war." We are of the opinion that a legitimate construction of the

language of this paragraph does not in any sense contravene the interpretation we have given above to the term " bonded debt," nor does any implication arise, from the use of these words in the paragraph just quoted, that the principal of the debt is alone referred to in the paragraph referring to the public-property fund. Both the provisions directing the application of the public-property fund and the inhibition against an increase of the bonded debt are but parts of a financial scheme which the framers of the constitution undertook to set out in that instrument. Preceding each of these restrictions, it is declared in paragraph 1, section 3, article 7, that no debt shall thereafter be contracted by or on behalf of the State, except to supply casual deficiencies of revenue, to repel invasion, suppress insurrection, and defend the State in time of war, or to pay the *existing* public debt. The debt which was allowed to be created to supply deficiencies in revenue was limited in the aggregate to two hundred thousand dollars. So that, in time of peace the legislature was absolutely prohibited from creating any debt in behalf of the State, except to pay the then existing public debt (eliminating further reference to deficiencies in revenue). It is a matter of which judicial cognizance may be taken, as we have before mentioned, that the public debt at the time of the adoption of the constitution (as well as now) was in the form of bonds. These bonds, sooner or later, would mature. They carried an obligation to pay both principal and interest, and it was wisely left to the discretion of the General Assembly to pay off the principal and interest of this debt, or to create a new debt for their extinguishment. But the power of the legislature in this regard was limited to the payment of the debt which then existed; and when the bonds which existed at the date of the adoption of the constitution matured, it was perfectly in the power of the legislature to create a debt, that is, to issue a new obligation for the payment of the old debt; but not one step further could they go. The effect of the provision is to fix, so long as the constitution remains in force, the maximum debt of the State. Having limited the power of the legislature to make a new debt, the framers further declared that the bonded debt should never be increased (in time of peace). Not that bonds might not be issued, bearing an obligation to pay not only principal but interest as well, but it should not be done to an amount greater than the amount of the debt which existed at the time of the adop-

tion of the constitution; and in forbidding the increase of the bonded
debt of the State, the increase of interest is necessarily forbidden.
There could have been no idea in the minds of the framers of the
constitution of separating principal and interest, when they forbade
the increase of the bonded debt. They had declared that no new
debt of any character should be created, and the object of this pro-
vision was simply, in addition, to declare that no more bonds should
be issued, except to take up and cancel the bonds which represented
the then existing public debt; and no legitimate inference can be
drawn, from the use of the words here used, that the term "bonded
debt," as used in other parts of the constitution, was intended to refer
alone to the principal of the bonded debt. If bonds were forbid-
den to be issued, the inhibition extended to the creation of a debt
represented by either principal or interest, or both.

It is further urged that section 14 of article 7 of the constitu-
tion requires the General Assembly to raise by taxation the annual
accruing interest on the bonded debt, and therefore that a contem-
plation that such interest may be paid out of the public-property
fund is to be excluded. The first clause of the paragraph to which
reference is made reads as follows: "The General Assembly shall
raise by taxation, each year, in addition to the sum required to pay
the public expenses and interest on the public debt, the sum of one
hundred thousand dollars, which shall be held as a sinking fund to
pay off and retire the bonds of the State which have not yet ma-
tured, and shall be applied to no other purpose whatever." It is
further provided that if the bonds can not at any time be purchased
at or below par, then the sinking fund directed to be raised may be
loaned, taking as security only the bonds of the State. It is evi-
dent from a careful reading of this section that it was intended to
deal alone with the subject of raising a sinking fund for the pay-
ment of the bonds, and that the framers of the constitution were
not, by the words which they employed, undertaking to direct how
and in what manner the interest on the bonded debt should be
raised. It is equally evident from the use of the words employed
that, while the sinking fund should only be applied to the bonded
debt, it should be done in a particular manner. The words, "be
held as a sinking fund to pay off and retire the bonds of the State
. . . and shall be applied to no other purpose whatever," are sus-
ceptible of but one meaning, and that is that this sinking fund

must go alone to such a payment of the bonds as will cancel them pro tanto; and in this connection attention is called to the difference in the requirement as to the disposition of the sinking fund and the requirement as to the' application of the public-property fund.   The former must be *applied* to the payment of the bonded debt, so as to cancel the obligation, while the latter must be *applied* to the payment of the bonded debt.   In other words, the sinking fund can not be used except to retire the bonds; and this is so, not from construction, but from a plain reading of the constitution.   The contention of the plaintiff in error is, practically, that the public-property fund can only lawfully be used in the same manner that the sinking fund is directed to be used.   If this is so, why should the framers of the constitution have used different language in respect to the application of the two funds?   Not only different language, but language with essentially different meaning.   In the one case it is lawful if the fund is *applied*, that is, devoted to the debt, and in the other case·it is unlawful to apply it, that is, devote it without extinguishing the debt.   The terms "apply" and "retire" (or extinguish) can not be given the same meaning except by a forced and unwarranted construction.   But, referring again to the sinking fund, if it becomes necessary, in order to retire a bond, that accrued interest shall be paid at the same time with the principal, we see no reason why that fund should not be so used, because the direction is to *pay off and retire* the bonds, and this can not be done unless the accrued interest be paid.   Under this provision it is evident that the fund can not be used to pay interest unless that payment retires the bonds from circulation, because the payment must be made in such a manner as will cancel the obligation of the State.   It is further urged that the mandate in this section of the constitution requires that a sum sufficient to pay the annual interest on the bonded debt shall be raised by taxation each year.   Not so, as we think.   The difficulty with the contention is that the force of the word "required," as it appears in the section, must be misdirected to sustain it.   The language is that the General Assembly shall raise by taxation, each year, in addition to the sum required to pay the public expenses and interest, the sum of one hundred thousand dollars, etc.   The raising of the one hundred thousand dollars is clearly mandatory.   No choice is left to the General Assembly whether it will raise a sinking fund

or not, nor whether the sum which they must raise shall be more or less than one hundred thousand dollars. But, conceding that the section by its terms is also mandatory as to the raising of funds to pay the public expenses and the interest on the bonds, the amount which it directs shall be raised is only that which is *required* to meet such expenses and pay such interest. At the time of the adoption of the constitution, the State was receiving a substantial income from some of the public property and from sources other than by direct taxation on property. Whether any of such funds are available to meet the payments mentioned, that is, expenses and interest, will depend on the action of the General Assembly in making appropriations for other purposes. Hence, it could hardly have been the purpose of the framers of the constitution to absolutely direct that the full amount necessary to pay the expenses of the State and the full amount necessary to pay the interest on the debt should be annually raised by taxation. Nor have they done so in the use of the word "required" as found in the section, which may be defined as "having imperative need" (Standard Dictionary). The direction as to raising "the sum required to pay the public expenses and interest" must have meant to refer particularly to the condition of the treasury. If there were on hand funds available to pay any part of the public expenses, or a part of the interest, there would be neither sense nor reason in directing that the full amount to pay each should be raised by taxation, and that there should be left for an indefinite time an available balance in the treasury, unused.

The construction which we give to this provision of the constitution is, as we think, sound as a logical proposition, and withholds nothing either from the words and spirit of the section or from the financial scheme appearing in the instrument. We are free to admit that while, under the views we entertain and have expressed, there is no constitutional inhibition against the application of the public-property fund to the extinguishment of the interest on the bonded debt, because such interest is just as much a part and parcel of the bonded debt as the principal, yet the framers of the constitution undoubtedly contemplated that it would be applied to the payment of both principal and interest; and perhaps (and in my judgment it was so) it was further contemplated that whenever there was a sufficient fund arising from the sale of pub-

lic property on hand, the legislature would cause bonds of the State
to be taken up pro tanto, whether at par or a premium, and cause
them to be canceled, thus working to the end of the final reduction
of the debt.    But, while contemplated, the direction to do this was
not given, and the final disposition of that fund was left to the
General Assembly, with the sole restriction that it should be ap-
plied to the payment of the bonded debt.    Necessarily it was fore-
seen that in succeeding years the General Assembly would be sur-
rounded by new and unexpected circumstances affecting the finan-
cial condition of the State; and while the policy of the makers of
the constitution was undoubtedly to reduce and extinguish the
debt — the bonded debt, the General Assembly seems not to have
been hampered by imposed restrictions in relation to the finances,
except on general and clearly indicated lines, and then in plain and
unambiguous language.    Undoubtedly it was the contemplation
that the bonded debt should be entirely extinguished, and, as was
said by Mr. Justice Cobb in the *Dawson Waterworks* case, supra:
" The State was not to be a perpetual interest-paying debtor."    The
means by which this end should be accomplished was defined, and,
if pursued, will in time accomplish the desired end as surely as a
correct result will be reached by a correct mathematical process.
The time required within which this can be brought about depends
upon conditions, and is indeterminate within a known limit.    As
we have endeavored to show, while the public-property fund must
go to the extinguishment of the bonded debt and is subject to be
applied to the payment of the interest on that debt, it may right-
fully be applied to the payment of the principal also.    But the re-
quirement that one hundred thousand dollars must come by taxa-
tion in each year as a sinking fund, which shall be applied, not, as
prescribed in the case of the property fund, to the payment of the
bonded debt of the State, but " to pay off and retire the bonds of
the State," is made in terms.    The application of the one fund is
legally made when it is devoted to the payment of the bonded
debt, paying it — principal — interest — one or both.    The appli-
cation of the other fund to the bonded debt is legal, under the terms
of the constitution, when that application has the effect to pay off
and cancel one or more of the obligations of the State.    One is to
be devoted to the payment of a debt, and if interest is a part of
that debt it may be legitimately applied, in whole or in part, to the

interest.   The other may not be devoted to the payment of inter-
est alone.   So that, as we view it, the application which is directed
to be made of the property fund is different from that commanded
to be made of the sinking fund.   Now it may be that the property
fund in certain instances will (as I think it ought to) be applied
to the payment of both principal and interest on the bonded debt.
If so, of course the bonds, pro tanto, will be retired and canceled,
and thus the financial millenium in the affairs of the State hastened.
If, however, the public property be not sold, or, if sold, the bonds are
not taken up and retired, but the proceeds are allowed to remain
in the treasury or devoted exclusively to that part of the bonded
debt which is represented by the interest, that desired event will
be retarded.   But in any event, if the financial scheme embodied
in the constitution remains in force and is carried into effect, time
is obliged to bring about the contemplated result, and in each year
the one hundred thousand dollars must be raised, must be set aside,
must be applied in such a manner as will retire and cancel the
bonds of the State.   This is, as we conceive, the scheme inaugu-
rated absolutely for the extinguishment of the bonded debt, made
mandatory by the constitution, while the mandate as to the prop-
erty fund leaves to the wisdom and intelligence of the representa-
tives of the people in the legislative branch of the government, sub-
ject to the approval of the executive, the details of its application
to the bonded debt of the State.

*Judgment affirmed.   All the Justices concurring, except Fish and
Cobb, JJ., who dissent.*

COBB, J.   Mr. Justice Fish and I are unable to agree with the
majority in the conclusion reached by them; and the reasons
which constrain us to enter our dissent upon the record are em-
braced in the following opinion.

On December 14, 1901, a resolution of the General Assembly in
the following words was approved by the Governor:

"Whereas there is in the State treasury $444,208, arising from
the sale of public property; and whereas it is a matter of grave doubt
in the minds of many members of the General Assembly as to
whether or not the public-property fund can be constitutionally ap-
plied to any other purpose except the payment of the principal of
the bonded debt of the State; and whereas the General Assembly

recognizes that as a business proposition the finances of the State are in such condition as to render it desirable, and even necessary, to apply the above fund to the payment of the interest, in order to avoid the imminent danger of a deficit in the State treasury, if the same can be done constitutionally, and desire to have the question submitted at once for adjudication; therefore be it

"Resolved by the General Assembly of Georgia, that the sum of $325,880 of said sum arising from the sale of public-property be, and the same is, hereby applied to and for the payment of the interest on the recognized valid bonds of the State, falling due in the year 1902.

"Resolved further, that the sum of $325,880 arising from the sale of public-property shall be, by the treasurer of this State, transferred, within one day after the approval of this resolution, from the public-property fund to the interest fund, and the same shall be paid out by the treasurer on such interest on the recognized valid bonded debt of the State as may mature in the year 1902, in accordance with the general appropriation act, approved December 21, 1900, and the treasurer is hereby authorized and directed to make such transfer and payment.

"Resolved further, that it shall not be inconsistent with the spirit of this resolution for the State treasurer to have the constitutionality of the requirement made by this resolution tested in the Supreme Court."

On December 16, 1901, the Governor addressed to the State treasurer a communication, calling his attention to the provisions of the foregoing resolution, and directing him to transfer, in accordance with such resolution, the sum of $325,880 from the public-property fund to the interest fund. The treasurer replied to this communication, declining to make the transfer as directed, on the ground that so doing would violate the constitution of the State. Thereupon the Governor filed a petition praying for a mandamus to compel the treasurer to make the transfer as required by the resolution of the General Assembly. On this petition a mandamus nisi was granted, and at the hearing the mandamus was made absolute. The treasurer brings the case here upon a bill of exceptions complaining of this judgment. While under the facts as they appear in the record several questions of more or less difficulty might arise, counsel insist in their briefs upon the decision of but

a single question. That question is thus stated by counsel for plaintiff in error: "The sole question in the case is, can the proceeds of the sale of public-property now in the State treasury be applied to the payment of current interest on the bonded debt before the maturity of the principal?". The attorney-general states it in this way: "The question presented by the record is, whether or not the General Assembly has the authority to apply money in the treasury arising from the sale of public property to the payment of interest on the public debt as the same may fall due." It is thus apparent that counsel not only agree upon the question involved, but also agree that no other question is presented for decision. The single question thus brought before us will be considered, and all others will be treated as in no way arising in the present case. The solution of this question depends upon the meaning to be given the term "bonded debt," as it appears in art. 7, sec. 13, par. 1 of the constitution, which declares that "The proceeds of the sale of the Western and Atlantic, Macon and Brunswick, or other railroads held by the State, and any other property owned by the State, whenever the General Assembly may authorize the sale of the whole or any part thereof, shall be applied to the payment of the bonded debt of the State, and shall not be used for any other purpose whatever, so long as the State has any existing bonded debt: *Provided*, that the proceeds of the sale of the Western and Atlantic Railroad shall be applied to the payment of the bonds for which said railroad has been mortgaged, in preference to all other bonds." Civil Code, § 5900. If this paragraph of the constitution is considered, isolated and alone, is the expression "bonded debt" to be given a meaning which includes both the principal and interest of such debt, or does it mean the principal only? The words are to be taken in their ordinary, natural, common sense, popular meaning, unless the context requires that they should be treated as used in a technical sense. Constitutions are the result of popular will, and their words are to be understood ordinarily as used in the sense that such words convey to the popular mind. 6 Am. & Eng. Enc. L. (2d ed.) 924−5. There is nothing in the paragraph under consideration which shows that the phrase "bonded debt" was used in any other way than in its ordinary and popular sense. What is the meaning of the expression "bonded debt?" It has been defined to be "that part of the entire indebtedness of a corporation, State, etc., which is rep-

resented by the bonds it has issued, as distinguished from floating debt." See Century Dictionary, tit. "bonded." If one were to ask, what is the entire bonded debt of a corporation, or a State, what would be the ready response of any one who was informed? It would simply be an amount representing the entire principal of the debt of that class. And so it would be if the question were asked, what is the floating debt of a corporation or State? The terms "bonded debt" and "floating debt" are popularly understood to mean the principal, and principal only, of the debts of those classes. If any official, or other citizen of this State, were to receive an inquiry to-day, asking what was the amount of the "bonded debt of the State," the answer would be ready and prompt, and the amount named would be the sum representing the principal of all the outstanding valid bonds of the State. It would never for one moment be presumed by any one that the inquiry referred in any way to the interest that might be due on the bonds at the date of the inquiry. The extremely accurate and extraordinarily prudent official or individual might add to his answer to such an inquiry words showing the rate of interest, when interest was last paid, the amount of interest due at that time, etc., etc.; but the ordinary official and the average individual would content himself with an answer that gave information as to the principal amount of the "bonded debt" only. The law deals at all points with the man of ordinary prudence and average capacity as the standard, for the simple reason that all communities and commonwealths are made up almost entirely of men of this class. Constitutions are adopted by commonwealths so made up, and the meaning to be given to the words of such instruments is that meaning which the man of ordinary prudence and average intelligence and information would give. Generally the meaning given to words by the learned and technical is not to be given to words appearing in a constitution. In other words, the popular meaning is to be given to the words of a constitution, unless the context, or the instrument taken as a whole, imperatively requires some other meaning. Before the words can be given a purely technical meaning which would be different from the popular meaning, the intention that they should be so understood must be plainly apparent and palpably manifest. It may be conceded that the terms "debt," "bonded debt," "mortgage debt," "floating debt," and all similar phrases include, in a technical and

strictly legal sense, both the principal and interest of the debt; but when such terms are taken in their usual and popular sense, they never refer to anything but the principal of the debt. So much for the paragraph of the constitution when it is considered isolated and alone.

The next inquiry is, what meaning is to be given to the expression " bonded debt" in the paragraph of the constitution above referred to, when we consider that paragraph in the light of the other provisions in the constitution relating to the subject of the indebtedness due by the State? The constitution declares that the "bonded debt" of the State shall never be increased, except for three designated purposes. Civil Code, § 5899. The phrase describing the debt referred to which is used in this paragraph is identical with the one used in the paragraph relating to the proceeds of the sale of public property, which will be hereinafter referred to as the " public-property fund." According to a well-settled rule of construction, the phrase must be held to mean the same thing wherever it occurs in the constitution, unless it manifestly appears, from the context or otherwise, that a different meaning was intended to be applied. It is contended that the phrase should in each instance be construed so as to read, the "principal and interest of the bonded debt of the State," etc. This would make the constitution declare that the "principal and interest of the bonded debt of the State shall never be increased, except to repel invasion, suppress insurrection, or defend the State in time of war." The amount of the bonded debt would be thus fixed at the principal and accrued interest at the date that the constitution was adopted, and this amount could never be larger. Such a construction would make the provisions of this paragraph absurd and unreasonable, and it can not, therefore, be adopted. The power of taxation over the whole State is limited by the constitution to certain purposes, among them being the following: "To pay the interest on the public debt;" "To pay the principal of the public debt." Civil Code, § 5882. The term " public debt" is broader than the term "bonded debt;" it not only includes the latter, but every other debt due by the public, floating or otherwise. In a popular sense it would be understood to mean the principal amount of all classes of indebtedness owing by the State. This meaning is apparent from the language of the paragraph just referred to, which refers to the prin-

cipal *of* the public debt, and the interest *on* the public debt. If public debt means the principal and interest of the debt due by the State, then the constitution authorizes the power of taxation to be used to "pay the interest *on*" the principal and interest of the debt due by the State, which would be an absurdity, in the light of the fact that the State never pays interest on interest. The constitution provides that a debt may be created to "supply casual deficiencies in the revenue," but such debt must not exceed in the aggregate two hundred thousand dollars. Civil Code, § 5888. No one, of course, will contend that the amount thus stated as the limit of the debt refers to both the principal and interest of the debt. The paragraph of the constitution providing for a sinking fund contains the expression "interest *on* the public debt," which is identical with the expression used in the paragraph relating to the purposes for which money may be raised by taxation. Civil Code, § 5901. In every paragraph of the constitution, other than that relating to the public-property fund (Civil Code, § 5900), whenever a term is used referring to the debt of the State, whether it is "bonded debt," "public debt," or simply "debt," it is plainly manifest that the term is used to refer to principal of the debt due by the State, exclusive of the interest *on* the same. This being true, it is clear that the term "bonded debt" in the paragraph relating to the public-property fund must be understood as used in the same sense therein as it and similar terms are used in other paragraphs. It is true that the paragraph of the constitution referring to the "bonded indebtedness" authorized to be incurred by cities and counties uses the expression, "principal and interest of said debt" (Civil Code, § 5894); and the paragraph relating to the bonds of the State which have been pronounced illegal uses the expression "principal or interest of the bonds or other obligations" (Civil Code, § 5898); but as these paragraphs bear only collaterally on the question under consideration, any inference drawn therefrom which would be inconsistent with the inferences to be drawn from paragraphs bearing directly on the question must of course be disregarded.

It is claimed that the constitution imperatively demands that the interest on the public debt shall be paid by a sum raised by taxation, and the paragraph relied on to support this contention is the one relating to the sinking fund, which declares that "The

General Assembly shall raise by taxation each year, in addition to
the sum required to pay the public expenses and interest on the
public debt, the sum of one hundred thousand dollars, which shall
be held as a sinking fund to pay off and retire the bonds of the
State which have not yet matured, and shall be applied to no other
purpose whatever.    If the bonds can not at any time be purchased
at or below par, then the sinking fund, herein provided for, may
be loaned by the Governor and treasurer of the State: *Provided,*
the security which shall be demanded for said loan shall consist
only of the valid bonds of the State; but this section shall not take
effect until the eight per cent. currency bonds issued under the act
of February 19th, 1873, shall have been paid." Civil Code, § 5901.
We do not see anything in this paragraph which requires the Gen-
eral Assembly to pay the interest on the public debt by taxation,
if there is in the treasury any money derived from any source what-
ever which can be applied to the payment of interest consistently
with the requirements of the constitution.    The sum required to
pay the public expenses and interest on the public debt is all that
is required to be raised by taxation; and if the public expenses and
interest on the public debt can be met from other sources, no sum
need be raised by taxation.    Under this view of the matter, the
paragraph referred to has no bearing whatever on the question now
under consideration; and we are simply brought back to the ques-
tion whether the public-property fund can be constitutionally ap-
plied to the payment of interest on the public debt before the ma-
turity of the principal.    If we have succeeded in demonstrating
that the term "bonded debt," as used in the paragraph of the con-
stitution relating to the public-property fund, means the principal
of the debt only, and that this conclusion can be properly arrived
at whether we consider that paragraph alone or in the light of other
provisions in the constitution, then we need go no further in the
investigation of this case; for if this be the proper meaning to be
given the term "bonded debt" in the paragraph referred to, then in
the same paragraph is to be found a distinct prohibition against
using the public-property fund for any other purpose whatsoever.
See *Park* v. *Candler,* 113 *Ga.* 647.

Let it be conceded, however, that the term "bonded debt" is an
equivocal expression, and may mean either principal or principal
and interest, and that, looking at all the provisions of the consti-

tution, it is not at all clear in which sense the term is there used. If it be doubtful in what sense the term is used in the constitution, it is permissible to look at the conditions surrounding the people at the time the constitution was adopted, and interpret any doubtful expressions in the light of such conditions. When the constitution was adopted the State had a bonded debt of more than $10,000,000, and the annual interest on the same was in round numbers $700,000. The constitution provides that no new debt shall be created except for certain specified purposes, all of which are extraordinary in their nature; that after certain bonds are paid off an annual sinking fund of $100,000 shall be raised; that the proceeds of the sale of railroads held by the State and other public property owned by the State shall be applied only to the payment of the bonded debt; and that the General Assembly may levy taxes to pay the principal of the bonded debt and the interest thereon. In the light of the financial condition of the State at the time the constitution was adopted, what was the intention of its framers, as well as of the people who adopted it, in reference to the financial affairs of the State in the future? What is the scheme of the instrument in so far as the public debt is concerned? What is the policy to be followed by those who live under it and those whose duty it is to obey it and enforce it? There seems to us to be but one answer to these questions. The State was to be relieved of debt. It was not to continue a perpetual debtor. There was to be a time when the State should stand altogether free from debt; and this result was to be accomplished by paying the interest annually from the proceeds of taxation or other funds of the State not set apart by the constitution to any specific purpose, and discharge the principal by the accumulation of the sinking fund and the proceeds of the sales of public property. The power to tax for the purpose of paying the principal of the public debt was given to authorize the raising of the sinking fund and any other sum that may be necessary to discharge the principal of the public debt in the event the sinking fund and the public-property fund are not sufficient for that purpose. See, in this connection, *Mayor and Council of Dawson* v. *Dawson Waterworks Co.*, 106 *Ga.* 696, 701; *Park* v. *Candler*, supra. To divert the public-property fund from the payment of the principal of the bonded debt to the payment of annual interest thereon, when no part of the principal is at the

same time paid off and discharged, is not only not consistent with the scheme and policy of the constitution, but is directly antagonistic thereto; and if such diversions are continued from time to time until the entire proceeds of sales of public property are exhausted, the well-conceived, clearly outlined, and manifestly wise policy of the constitution will be entirely and completely destroyed and abrogated, and the evident intent of the framers and people will be completely ignored.

But it is said that if the meaning of the term "bonded debt" is not clear or is doubtful, then there is in the constitution no express prohibition against the use of the public-property fund for the payment of current interest on the public debt, when no part of the principal is at the same time discharged. Let this be conceded, and still the application of the fund in question to the payment of interest alone would nevertheless be illegal. Limitations upon the power of the General Assembly may arise by implication as well as from the effect of an express prohibition, and when so arising they are none the less to be regarded. 6 Am. & Eng. Enc. L. (2d ed.) 934, note 6, citing Page v. Allen, 58 Pa. St. 338, s. c. 98 Am. Dec. 272. The case just cited was dealing with a law providing for the registration of voters, which made a condition of registry the possession by the voter of certain qualifications additional to those prescribed by the constitution, there being nothing in the constitution expressly prohibiting the legislature from requiring that the voter should have such qualifications. In the opinion of the court by Thompson, C. J., there is the following language: "It is usual on the part of those who insist on the constitutionality of any given statute, to claim that it must be regarded as constitutional, unless expressly prohibited by some provision in the constitution. In other words, in construing the constitution of the State, whatever is not expressly denied to the legislative power is possessed by it. The opposite of this rule, I may remark, is the rule of construction of the Federal constitution. I assent to this, but not that the inhibitions of the constitution must always be express. They are equally effective, and not less to be regarded, when they arise by implication, and this is the case when the legislative provision is repugnant to some provision of the constitution. Leib v. Commonwealth, 9 Watts, 200; Hill v. Humphrey, 5 Watts & S. 424 [39 Am. Dec. 117]; Eakin v. Raub, 12 Serg. & R. 330; Common-

wealth *v.* Maxwell, 27 Pa. St. 444; Chase *v.* Miller, 41 Id. 403.
To illustrate this idea: The executive power of the State, under
the constitution, is lodged in a governor; and the legislative in a
senate and house of representatives. It would be manifestly re-
pugnant to these provisions of the constitution if an act of assem-
bly should provide for the election of two executives, or two sen-
ates and houses of representatives, at the same election; yet it
would be unconstitutional only by implication, there being no ex-
press prohibition on the subject. So, in regard to qualification
for office. An act which should require a residence in the State
for ten years, instead of three, or an age of fifty years, or freehold
estate, in order to be eligible to the office of representative, would
be void for repugnancy, because differing from the qualification ex-
pressed in the constitution, and would be so only by necessary im-
plication — necessary to keep legislation within the paramount
rules of the constitution." When from the constitution itself, or
from the constitution in the light of contemporaneous public his-
tory, a well-defined, complete, and orderly plan and scheme for the
discharge of the public debt is plainly apparent, and the policy to
be followed in the future is clearly derivable from the instrument,
is there not necessarily an implication that the General Assembly
shall have no power to do anything which will subvert the plan
and ignore the policy of the constitution? Is not the statement
of such a question the only answer that it requires?

If anything is needed to reinforce the conclusion we have
reached in this case, all that is necessary is to look at the constitu-
tion in the light of the proceedings of and debates in the convention
that framed it. The question was first brought before the conven-
tion on July 16, 1877, by a resolution by Mr. Wofford, which was
adopted. The resolution was as follows:

"Whereas it is probable a clause of prohibition of the further
issuance of bonds, or other indebtedness of the State of Georgia,
will be incorporated in the constitution; and whereas it is impor-
tant that the present debt of the State be paid as rapidly as possible,
that the people may be delivered of the enormous and ruinous rate
of interest which they are paying. Therefore,

"Resolved, 1st, That a committee of one from each congressional
district be appointed by the president to inquire if the property of
the State can be made available for the purpose of the payment of
the public debt. And

" 2d.    If it can be made so available, to report such an ordinance, or other measure, as they may deem advisable.

" 3d. That the treasurer of this State report to this house the precise amount of the public debt, funded and floating.

"4th. Also to what extent the State is liable as endorser." Jour. Const. Conv. 1877, 51; Small's Debates, 35.

On July 18, Mr. Tharpe introduced the following resolution, which was adopted: " Whereas the public debt of the State of Georgia is now over eleven millions, with only about one third of the property owned before the war; and whereas the rate of taxation is about eight times as great as before the war; and whereas this heavy tax is not more than enough to pay the current expenses of the State, and the annually accruing interest of the public debt, without producing any sinking fund for its reduction; and whereas it is deemed impolitic and impracticable to increase the present burdensome rate of taxation; therefore, be it resolved, that a committee of one from each congressional district be appointed to inquire into the propriety of selling the Western and Atlantic, Macon and Brunswick, and North and South Railroads, in order to pay the indebtedness, and to reduce taxation; said committee to report at the earliest practicable moment." Jour. Const. Conv. 1877, 68; Small's Debates, 47.

On July 27, the committee appointed under the Tharpe resolution made a report which was, in substance, as follows: That the first General Assembly after the adoption of the constitution shall cause to be created a commission, who, with the Governor, should be authorized to sell, after August 1, 1879, the North and South, Macon and Brunswick, Memphis Branch, and Western and Atlantic Railroads; the report fixing the minimum amounts for which the Macon and Brunswick and the Western and Atlantic Railroads should be sold, and providing that the other railroads named in the report should be sold for such sums as they would bring in the market. The report further provided that " The money so raised shall, by said commission, be immediately invested in the bonds of the State, stamped, deposited with the treasurer, and reported to the Governor;" and that "No part of the proceeds of said sales shall be used for any other purpose than the redemption of the bonds of the State." Jour. Const. Conv. 164 – 5; Small's Debates, 129. On July 31, the committee on final revision submitted a report on "Finance, Taxation, and the Public Debt," containing the various

provisions on these subjects, which they recommended to be grouped in the constitution in one article. The following sections of this report are material to the present discussion:

"Section 1. The powers of taxation over the whole State shall be exercised by the General Assembly for the following purposes only: for support of the State Government; for educational purposes; to pay the interest on the public debt; to pay the principal of the public debt.

·"Section 3. No debt shall be contracted by or on behalf of the State, except to supply casual deficiencies of revenue, to repel invasion, suppress insurrection, and defend the State in time of war, or to pay the existing public debt; but the debt created to supply deficiencies in revenue shall not exceed, in the aggregate, two hundred thousand dollars.

"Section 12. The bonded debt of the State shall never be increased, except in the cases in which the State is authorized to contract debts enumerated in the first paragraph of the third section of this article.

"Section 13. The following described bonds of the State of Georgia are legal and valid, and their legality and validity shall never be questioned, and the principal and interest thereon shall be paid. The bonds thus described embrace all the legal and valid bonds of the State, and all others are illegal, null and void. The legal and valid bonds are as follows:

6 per cent. currency bonds due 1878–1886, by act of February 27, 1856 . . . . . . . . . . . . . . . . . $900,000

7 per cent. currency bonds due 1886, by act of March 12, 1866 . . . . . . . . . . . . . . . . . . . . . 3,600,000

7 per cent. gold bonds due 1890, by act of September 15, 1870 . . . . . . . . . . . . . . . . . . . . . 2,098,000

7 per cent. currency bonds due 1892, by act of January 18, 1872 . . . . . . . . . . . . . . . . . . . . . 307,500

8 per cent. currency bonds due 1878–1886, by act of February 19, 1873 . . . . . . . . . . . . . . . . . . 900,000

7 per cent. currency bonds due 1896, by act of February 24, 1876 . . . . . . . . . . . . . . . . . . . . 542,000

6 per cent. currency bonds due 1889, by act of February 19, 1877 . . . . . . . . . . . . . . . . . . . . 2,298,000

$10,645,500

" 2. In addition to the above-named amount, the State may hereafter become liable, from endorsement, for $464,000 of the bonds of South Georgia and Florida Railroad, said bonds to the stated amount having been legally endorsed by proper authority.

" Section 14. The proceeds of the sale of the Western and Atlantic, Macon and Brunswick, or other railroads held by the State, and any other property owned by the State, whenever the General Assembly may authorize the sale of the whole, or any part thereof, shall be applied to the payment of the bonded debt of the State, and shall not be used for any other purpose whatever, so long as the State has any existing bonded debt.

" Section 15. The General Assembly shall raise by taxation each year, in addition to the sum required to pay the public expenses, and interest on the public debt, the sum of one hundred thousand dollars, which shall be held as a sinking fund to pay off and retire the bonds of the State which have not yet matured, and shall be applied to no other purpose whatever. If the bonds can not, at any time, be purchased, then the sinking fund herein provided for may be loaned by the Governor and the treasurer of the State, provided the security which shall be demanded for said loan shall consist only of the valid bonds of this State." Jour. Const. Conv. 204–210; Small's Debates, 182–4.

On August 24 the committee appointed under the Wofford resolution made a report which was, in substance, as follows: The property owned by the State should be pledged for the payment of its existing debt, and to that end certain property of the State mentioned in the report should be sold as soon as practicable, and the proceeds of the sale used in the payment of the debt as it became due; that portion of the proceeds which must be kept on hand to await the maturity of the debt to be loaned or invested, as provided in the constitution then being formed. The General Assembly should be requested, at its first session after the adoption of the report, to enact such laws as might be necessary to carry into effect the recommendation made above, and to provide for the sale of the property before it should have further deteriorated in value. The General Assembly should be recommended to employ an able commission for the purpose of effecting the sales of the property mentioned, and this commission should be vested with a large discretion as to the price for and the terms upon which the sales should

be had.    In the judgment of the committee presenting the report, the State should never issue bonds at a greater rate of interest than six per centum, and all bonds thereafter issued should be redeemable at the option of the State after the expiration of five years. Jour. Const. Conv. 557–9 ; Small's Debates, p. 440.    On August 25, the constitution was adopted by the convention, and provision was made for submitting it to a vote of the people.    Jour. Const. Conv. 568, 570.    On August 9, section 14 of the report of the committee on Finance, Taxation, and Public Debt, above referred to, came before the convention for adoption, and the following debate occurred :

"Mr. Jenkins, of Richmond.    It seems to me that an amendment should be added to that section.    As it reads, it seems that if the Western and Atlantic Railroad were sold, and any bonds other than those for which that road is mortgaged should fall due before them, the proceeds of the sale might be applied to those bonds. My point is, that inasmuch as the road has been mortgaged by the State to pay certain bonds, this clause should certainly give those bonds the preference out of the proceeds of the sale.

"Mr. Mynatt.    I offer this amendment: 'That the proceeds shall be applied to the extinguishment of the bond of indebtedness of the State in the order of their priorities.'

"Mr. Hammond, of Fulton.    I move to strike out the section. It seems to me it would be the proper thing, if the road is sold, to apply the proceeds to the bonded debt.    It might be sold at a time when none of the public debt was due, and none of that debt could be paid by it.    The General Assembly would have six or eight millions of dollars upon their hands which could not be appropriated to any other purpose.    The State can not compel the holders of her bonds to receive payment for them until they are due.    I propose to leave the whole matter to the legislature, where it properly belongs, and where it can be properly regulated.

"Mr. Warren, of Chatham.    I desire that the people of Georgia in convention assembled should say to the people who hold the obligations of the State, that the public property of the State is pledged as security for the payment of their debts.    I think that we should sell the whole of it and apply the proceeds to the payment of these debts.

"Mr. Maddox.    Suppose that you sold the road next year and

none of these bonds were due until 1886, what are you going to do with the money?

"Mr. Warren. You will have no trouble in buying bonds of the State if you have got the money to buy them with, and will pay the market price. We should not squander this money and, when the bonds fall due, be compelled to wring it from the people in taxes. We had better retire five millions of dollars of this debt with six millions dollars worth of bonds, than to squander six millions and owe the five millions and have to get it from the people in taxes when we have it to pay. And in this selling of a large amount of the property, like the State road, it is much more than likely that we can sell it for a better price in bonds of the State — say two or three hundred thousand dollars down, and so much year after year, with the interest upon them. I am in favor of pledging every dollar of public property to this purpose, and the proceeds of the sale of this property shall go to no other purpose while we have a public debt.

"Mr. Davis, of Dougherty. I propose to amend by saying that the proceeds shall go first to the bonds of the Western and Atlantic Railroad and then to the other bonded debt of the State.

"The President, pro tem. Mr. Jenkins' amendment is first in order.

"The secretary read the amendment proposed by Mr. Jenkins of Richmond, as follows: 'Provided, that the proceeds of the sale of the Western and Atlantic Railroad shall be applied to the payment of the bonds for which said railroad has been mortgaged, in preference to all other bonds.'

"Mr. Bass. I can not see the necessity for adopting any such amendment as that. If the State road, upon which this mortgage is held, should ever be sold, it is very evident that the purchasers would have sagacity to look to their own interests, and that they would not purchase it and pay the purchase-money unless it was established that the proceeds should be paid to cancel these mortgage bonds. As it would be to the interests of the purchasers to look after this matter, I do not see any necessity for putting this amendment here.

"Mr. Jenkins, of Richmond. I believe the better plan would be to leave this whole matter to the legislature — the appropriation of the proceeds to these sales. But if the convention intends to leg-

islate upon the subject, it is very clear that if they are to be devoted to the bonded debt of the State generally, those debts which have been secured by mortgage on the road should be preferred over all others. If this goes out to the world without this proviso, it would have the effect to depress the bonds of the State secured by that mortgage, and it would appear as though you did not respect the mortgage and did not intend to stand up to your obligations. I feel some solicitude upon this subject, because I was Governor of Georgia when this proceeding was authorized, and because my name is signed to the bonds of the mortgage. I say the possibility of passing this section without the security contained in the amendment would be to cast doubt upon the validity of the security. It would alarm the public mind and depress these bonds. I say that you should provide that the proceeds of the sale of the Western and Atlantic railroad should be held to secure the payment of the bonds for which it was mortgaged.

"The amendment of Mr. Jenkins was agreed to. The motion to strike out was rejected. The section as amended was then agreed to." Small's Debates, 310—11.

The foregoing extracts from the journal and debates of the convention embrace, we believe, every word that was used in resolutions, reports, or debates on the subject of the public debt of the State and how it should be paid. Is there anything in any of them from which it could be inferred that it was the purpose or intention of a single member of the convention that the public-property fund should be used for the payment of interest on the public debt when no part of the principal was at the same time discharged by payment from such fund? On the other hand, is it not clear from the language of every resolution and report, as well as from every word uttered in debate, that the proceeds of the sales of public property were to be used solely as a means to an end, and that end was to discharge the principal of the public debt, so that in time the State would be free from debt, without subjecting the people to a ruinous tax rate to meet the bonds of the State at their maturity? Would not this end be entirely defeated by the use of such proceeds for the payment from time to time of interest only until the public-property fund is exhausted? Suppose the public-property fund had been used for the payment of interest from the time the constitution went into effect, what would have been the

result? The bonded debt of the State at that time was $10,644,-
500, bearing interest annually amounting to $719,135. Of these
bonds $1,800,000 matured in installments between 1878 and
1886, and $3,600,000 also matured in 1886. If the entire pub-
lic property had been sold and used to pay the interest on the debt
and the installments of the $1,800,000 (the sinking fund not going
into operation till they were retired), there would not have been
enough of the proceeds left to pay the $3,600,000 at maturity,
leaving $4,396,000 due in 1889 and 1890, as well as $849,500 due
in 1892 and 1896, entirely unprovided for and unsecured. Will
any one contend that this result would have been consistent with
the purpose, policy, plan and scheme of the constitution, or the in-
tention of the framers or the people who ratified it? It is said,
however, that the conclusion we have reached would make the con-
stitution provide for an unwise financial scheme, in that the pub-
lic-property fund must lie idle in the treasury awaiting the matu-
rity of the bonded debt. Whether wise or unwise, if the constitu-
tion requires this, it must be obeyed. But do the terms of the
constitution necessarily require this? The constitution says that
the proceeds of the sale of public property "shall be *applied* to the
payment of the bonded debt of the State." What was meant by
the word " applied?" The word " apply" is defined as follows: To
put to use; to use or employ for a particular purpose, or in a par-
ticular case; to appropriate; to devote; as, to apply money to the
payment of a debt. Webster. To use or employ for a particular
case, or devote to a particular purpose ; as, to apply a sum of money
to the payment of a debt. Century Dict. & Enc. If the bonds of
the State can be purchased at par, such purchase would clearly be
an application of the money used to the payment of the debt. If
the bonds are at a premium, a purchase at a premium would be an
application of the money used to the payment of the debt. Any
sum of money used by a debtor in such a way as to discharge a
debt due by him is applied to the payment of the debt, whether the
sum be the exact amount of the debt, or less than that amount, or
greater than that amount. When money is set apart for the pay-
ment of a particular debt, and reaches the hands of the debtor be-
fore the maturity of the debt, it is often to his interest to pay the
creditor a premium rather than allow the money to lie idle, or to
use the same in some way whereby the return of the same in time

32

to meet the debt would be uncertain. To pay the creditor under such circumstances the amount of his debt and an additional sum as a consideration for receiving payment before maturity would be applying the whole sum so paid to the payment of the debt. By the use of the broad term "applied," is not this whole matter of how the funds arising from the sale of public property, which reach the treasury before any of the bonds are due, left to the wisdom and discretion of the General Assembly? This seems to have been the view entertained by Mr. Warren, whose remarks in the convention are quoted above. The constitution prohibits the purchase of bonds with the sinking fund, unless they can be bought below or at par; but there is no such provision in reference to the public-property fund. The constitution also authorizes the loan of the sinking fund, if the bonds can not be bought at or below par; but there is nothing in the constitution authorizing the loan of the public-property fund. Civil Code, §§ 5900-5901. The sinking fund can not be used to purchase bonds when they are at a premium; and when this is the case it may be loaned out in order to make interest. The public-property fund can not be loaned out under any circumstances; and rather than allow the same to lie idle for a long period, there seems to be no good reason why it may not be applied in payment of the bonded debt by purchasing bonds at a premium whenever the General Assembly shall so authorize; there being nothing in the constitution expressly prohibiting this from being done, and such a course being entirely consistent with the plan, scheme, and policy outlined in the constitution for the final redemption of the State from a condition of indebtedness.

The reasons above set forth are those that have irresistibly forced us to the conclusion that the resolution of December 14, 1901, providing for the transfer of a portion of the public-property fund to the interest account and the application of the same to the payment of interest on the public debt, is a violation of the constitution. Before leaving the discussion, however, it is proper to refer to some of the grounds, not mentioned above, which were urged as reasons why the resolution should not be declared unconstitutional, and state what to us seems to be the reasons why such grounds should not prevail. It is said that a debt may be composed of one part only, the principal, when there is no contract to pay interest; or of two parts, principal and interest, when there

is a contract to pay interest; and that when we use the word "debt," both principal and interest are included, and that the law considers interest promised as a part of the debt as it accrues; and authorities are cited to sustain these several propositions. See *Baxter* v. *Bates,* 69 *Ga.* 587; *Almand* v. *Almand,* 95 *Ga.* 204; *Magarahan* v. *Wright,* 83 *Ga.* 775; Edwards *v.* Bates County, 163 U. S. 269; City of Lexington *v.* Butler, 14 Wall. 282; City *v.* Lawson, 9 Wall. 483; Crouse *v.* Park, 3 U. C. Q. B. 458; McCalla *v.* Ely, 64 Pa. St. 254. Let it be conceded that debt, as generally understood in a strictly legal and technical sense, means both principal and interest, and that the authorities cited sustain the propositions contended for; this establishes the rule of construction applicable in the case of private writings. These rules are not to be followed in interpreting a constitutional provision, when the circumstances attending the adoption of the constitution show conclusively that the words in question were not used in a technical sense. See 6 Am. & Eng. Enc. L. (2d ed.) 925. It is said that "the admitted value of the Western and Atlantic Railroad is $10,000,-000, and of the equity in the Northeastern Railroad $107,000," and that these amounts, added to the sinking fund that must be raised to pay the bonds at maturity, will more than discharge the principal of the public debt; and that for this reason the General Assembly should be allowed to direct the application of the fund now in the treasury. If at the maturity of all the bonds any interest is due on any of them, and there is a surplus of the public-property fund over and above the amount necessary to discharge the principal of the bonds, such surplus could undoubtedly be applied to the payment of the interest on the bonds; and it may be that at the maturity of any of the bonds any remnant of interest on the same might be lawfully paid from the public-property fund, when such payment is made simply as an incident of discharging the principal; but when no part of the principal is due and none is to be discharged, no part of the public-property fund can be devoted to the payment of interest alone, not even upon the assumption that the present value of the property of the State will be maintained, and that therefore at the maturity of its bonds a sum will be realized which will be more than sufficient to pay off the principal. The simple answer to the proposition contended for is, that property is liable to deteriorate in value, and we can not know what will

be the value of any of the property of the State at the distant time in the future,· when the public-property fund is required by the constitution to be on hand and available to discharge the public debt in order that an excessive and exorbitant tax levy for this purpose may be avoided.

It is said that contemporaneous construction of the constitution by the executive and legislative departments of the State and the practice of such departments are entitled to weight and consideration in arriving at the meaning of the constitution ; and authorities are cited to sustain this proposition. See *Wellborn* v. *Estes,* 70 *Ga.* 390; *Howell* v. *State,* 71 *Ga.* 225; U. S. *v.* Moore, 95 U. S. 763. Applying the principle above referred to in the present case, it is said that in 1882 the General Assembly applied a portion of the public-property fund to the payment of interest on the public debt. See Acts 1882–3, p. 14. While there were in this General Assembly some of the ablest lawyers in the State and some who had been members of the constitutional convention, and the act was approved by a Governor who took rank as an able constitutional lawyer, this one isolated instance in a period of twenty-four years is not sufficient to establish a legislative or executive practice which the courts will recognize to solve a doubt that may exist as to what is the true interpretation of the constitution ; and it is therefore to be considered only to the same extent that the opinion of so many citizens of the State, both lawyers and laymen, should be considered. While we have the greatest respect for the opinion of the lawyers who were in that General Assembly, and especially for the able and learned lawyer who was a member of that body as well as a member of the Constitutional Convention and is now a member of this court (Mr. Justice Little), still we are constrained to disagree with the conclusion reached by the General Assembly as evidenced by the passage of the act above referred to. A period of nearly a quarter of a century has elapsed since the constitution was adopted, and only once during that time has either the legislative or executive department expressed an opinion contrary to that we have reached in the present case. The act was passed nearly five years after the constitution was adopted, and after the lapse of such a period of time it can hardly be considered as a contemporaneous legislative construction of the constitution. The long-continued and unquestioned exercise of a power either by the General Assem-

bly or the executive is a weighty argument in favor of the consti-
tutionality of the exercise of such authority, especially where the
constitutional provision relating to the power is doubtful or ambig-
uous.   See *Solomon* v. *Cartersville*, 41 *Ga.* 161; 6 Am. & Eng. Enc.
L. (2d ed.) 933.   But the occasional exercise of power by either
the legislative or executive department, or by both, is not entitled
to much weight on the question of whether the power is properly
derived from the constitution.   A single exercise of power by the
legislative and executive departments in a period of many years,
under which no rights have vested, will not be entitled to serious
consideration when the question is before the courts for the first
time.   The legislative or executive disease, which is sometimes al-
lowed to paralyze the once healthy member of a constitution, is in
all cases chronic and progressive, and never acute or spasmodic.

There are invoked in the present case the well-settled rules of
construction to be followed in passing upon the validity of the acts
and resolutions of the legislative department, that every presump-
tion should be indulged in favor of the proper exercise of authority
by the lawmaking power, and all doubt should be resolved in favor of
the constitutionality of the act or resolution in a given case.   What
is the reason of these rules?   The General Assembly is a co-ordi-
nate department of the government with the judicial, and those who
compose that department are as much bound by the constitution as
the members of the judicial department, all being bound by oath
to support and defend the constitution.   That department has
exclusive power of making laws, and when it exercises the power
the law presumes that the right under the constitution to make
the law has been seriously considered and deliberately passed on;
and when nothing to the contrary appears on the face of the law or
in the journals of the General Assembly, every act or resolution
comes before the courts as if accompanied by the solemn assev-
eration under oath of each member of the General Assembly that
voted in favor of it, that in his deliberate opinion the constitu-
tion authorized the action taken by the body of which he was a
member.   Yea, more than this, there is also implied that no doubt
exists in the minds of the members of the General Assembly, who
voted in favor of the law, as to its constitutionality; for the rule is
that a member of the lawmaking department of the government
who has a doubt as to the constitutionality of the proposed meas-

ure should always resolve this doubt by voting against the measure. Upon this rule governing the legislative department largely rest the reasons upon which the opposite rule which controls the judicial department is founded. Upon this subject Judge Cooley says: "But when all the legitimate lights for ascertaining the meaning of the constitution have been made use of, it may still happen that the construction remains a matter of doubt. In such a case it seems clear that every one called upon to act where, in his opinion, the proposed action would be of doubtful constitutionality, is bound, upon the doubt alone, to abstain from acting. Whoever derives power from the constitution to perform any public function is disloyal to that instrument and grossly derelict in duty if he does that which he is not reasonably satisfied the constitution permits. Whether the power be legislative, executive, or judicial, there is manifest disregard of constitutional and moral obligations by one who, having taken an oath to observe that instrument, takes part in an action which he can not say he believes to be no violation of its provisions. A doubt of the constitutionality of any proposed legislative enactment should in any case be reason sufficient for refusing to adopt it; and, if legislators do not act upon this principle, the reasons upon which are based the judicial decisions sustaining legislation in very many cases will cease to be of force." Cooley's Const. Lim. (5th ed.) *74.

Is there any presumption at all in favor of the constitutionality of a resolution in a case where the General Assembly on the face of the resolution states that there is in the minds of many of its members grave doubt as to the constitutionality of the resolution? In such a case if the reason of the rule which requires the courts to resolve all doubts in favor of the action of the lawmaking department does not entirely cease to exist, is not the presumption very much weakened, and are not the courts free to pass upon the constitutionality of the resolution, practically unhampered by any presumption in its favor? In the preamble to the resolution under consideration in the present case it is recited: "Whereas it is a matter of grave doubt in the minds of many members of the General Assembly as to whether or not the public-property fund can be constitutionally applied to any other purpose except the payment of the bonded debt of the State." The preamble further recites a "desire to have the question submitted at once for adjudi-

cation," and the resolution provides in effect that the treasurer must submit the question to the courts.   Nothing could be clearer than that the General Assembly has not attempted to pass upon the question of the constitutionality of the resolution; and such being the case, is there any presumption at all in favor of its constitutionality arising from the mere fact that the General Assembly has adopted it ?

The preamble to the resolution recites that " The General Assembly recognizes that as a business proposition the finances of the State are in such condition as to render it desirable, and even necessary, to apply the above fund to the payment of the interest, in order to avoid the imminent danger of a deficit in the State treasury ;" and the record discloses that there will be in 1902 a deficit of about $160,000 in the general fund in the State treasury if this resolution is not carried into effect. . This fact should have no weight whatever in determining the constitutionality of the resolution.   The argument ab inconvenienti, as a general rule, should have little weight in interpreting the provisions of a constitution.   See Anderson's Law Dict. tit. ab inconvenienti.   A resulting inconvenience must not be overcome by ignoring the evident intent of the provision.   See 6 Am. & Eng. Enc. L. (2d ed.) 923, and cases cited in note 9.   Especially will the argument from inconvenience not be at all considered when the  General Assembly has, under the constitution, ample power to have prevented the inconvenience as well as full authority to remedy it, without reference to the action contemplated in the resolution under consideration.   The inconvenience referred to in the preamble to the resolution is, to say the most of it, temporary and can be easily removed by the simple exercise of an undoubted and unquestioned power of the General Assembly.   But, without regard to the character of the inconvenience, whether it be temporary and passing and therefore practically harmless, or permanent and enduring and therefore seriously injurious, we must not allow it to have one feather's weight when we are satisfied that the remedy provided is not authorized by the constitution.   In determining the question before us it is our solemn and bounden duty to look only to the past which produced the constitution, and the future when its provisions are to be carried out and its designs are to be fulfilled, and close our eyes to the temporary embarrassments, complications, and

difficulties of the present. We have endeavored to do this, and in so doing have reached the conclusion stated above. Under the operation of the scheme of the constitution as we see it and as it has been followed, with the single exception of the act of 1882 above referred to, the bonded debt of the State has been reduced from $10,644,500 in 1877 to $7,731,500 in 1902, and the annual interest charge from $719,135 to $330,380 ; and if the design of the constitution is allowed to be fulfilled, the whole debt will in time be completely discharged, and there will be no necessity for an exorbitant and burdensome tax levy in any given year. But, on the other hand, if the public-property fund is diverted from its true channel and used for the payment of interest only, whenever the bonds of the State mature, it will be necessary either to levy a tax to pay the principal, which will be burdensome in the extreme, or renew the debt from time to time far into the future. Both of these contingencies were intended to be avoided by the provisions of the constitution. The evident intent of the constitution is that the public debt must be paid, so that the State may be at some time free from debt, and this result must be accomplished without the necessity of resorting to an exorbitant tax levy in any given year or series of years. The inevitable result that would follow from a compliance with the resolution under consideration would be to keep the State in the position of an interest-paying debtor far into the future,— a result which is not contemplated by the constitution, and one that the provisions of that instrument were intended to avoid..

In conclusion I desire to say for myself that when the question involved in the present case was first presented, the mental impression formed was that the solution of the matter was in the application of the undoubted general rule, that interest is a component part of every interest-bearing debt. After much time spent in investigation and anxious thought, this first impression has entirely disappeared, and I have reached the conclusion stated in the foregoing opinion, and as to its correctness I have now not even a last lingering doubt. What the constitution means, as well as what the framers who made it and the people who ratified it intended it to mean, seems now as plainly visible as does the noonday sun in a cloudless sky. The constitution should be obeyed, no matter what may be the consequences of obedience. Ita lex scripta est.