## COUNTY OF WALTON et al. v. COUNTY OF MORGAN.

1. The constitution (Civil Code, § 5883) requires that taxation shall be uniform on " all property subject to be taxed within the territorial limits of the authority levying the tax ;" yet as single tracts of land or manufacturing plants divided by county lines are not wholly in a single territorial limit, the legislature may provide in which county the return in such exceptional cases shall be made.

2. In view of the provisions in the Civil Code, § 5883, and Political Code, § 820, all other land must be returned in the county where the land lies.

3. When construed in pari materia with the Civil Code, § 5883, and Political Code, § 820, the provision in the Political Code, § 826, that all other companies or persons shall make their returns to the receiver of the respective counties where the persons reside or the office of the company is located, refers to personal property.

4. The provision of section 8 of the tax act of 1902, that manufacturing plants divided by county lines shall be returned in the county where the main buildings containing machinery or most of said buildings are located, does not, so far as real estate is concerned, vary the terms of the general law as contained in the Political Code, § 826.

5. In the absence of a statute, personal property is to be returned where the owner resides.

6. The General Assembly may fix the taxing situs of all tangible or intangible personal property, but it must be by general law, and classified according to the nature of the property, and not according to the nature of the owner.

7. The General Assembly may provide that fixtures, machinery, or improvements in manufacturing plants, or personal property attached thereto or in actual use therein, shall be returned and taxed with the real estate.

8. Merchandise, cotton, manufactured goods, or personal property not attached to or used in connection with such real estate, must, under the Political Code, § 826, be taxed where the owner lives, and the same rule must be applied to similar property owned by a manufacturing company.

9. The petition was not demurrable. The act of August 17, 1903, providing a remedy, did not affect any right of the parties.

Argued May 21, — Decided July 13, 1904.

Petition for direction, etc. Before Judge Russell. Walton superior court. February 20, 1904.

The High Shoals Manufacturing Company owns a single manufacturing plant, with dam, water-power, land, buildings, and machinery, located partly in each of three counties, the raw and manufactured material and other personal property being first in one and then in another of these counties. Some of the land and the greater part of the water property is in Oconee county; the main building, some of the operatives' houses, the machinery, and the most valuable part of the plant are in Morgan county; the dye-house, the remainder of the operatives' houses, and the offices of the company are located across the line in Walton county, in which the charter locates the principal office of the company. The company made its tax returns for 1903 in Walton county; whereupon the authorities of Morgan county filed a petition under the act approved August 17, 1903 (Acts 1903, p. 16), for direction and judgment as to which county was entitled to the return and taxes, contending that, except as to notes and accounts, the returns should have been made, and the tax on the entire plant and tangible personal property should have been paid, in Morgan county, as required by section 8 of the tax act of 1902, which provides " that if the real estate or plant of any of said companies

or persons is located on or across a county line or county lines, and in two or more counties, said real estate, together with the buildings and machinery thereon, and all personal property made by or used in connection with or for the purpose of operating said manufacturing or other plants, shall be returned to the tax-receiver of the county wherein are located the main buildings containing machinery or most of said main buildings, and the money notes and accounts and other like property may be so returned, or may be returned to the tax-receiver of the county wherein the principal officer or residence of such companies or persons is located."

The County of Walton and the High Shoals Manufacturing Company demurred, and also answered. By the answer, in support of which evidence was offered, Walton County and the manufacturing company contended, that by charter the manufacturing company's place of residence was located in Walton county; that the plant was operated as a unit for the manufacture of cotton goods; that the tax returns for 1903 had already been made in the County of Walton before the approval of the act of August 17, 1903, which provided for the filing of the form of petition like that presented by the County of Morgan; that none of its personal property made by or used in connection with or for the purpose of operating the plant was ever, during the year 1903, in the County of Morgan, except temporarily; that all of it became the property of the defendant in Walton county, and whenever any part of it, such as raw material, supplies, or other personalty, may have been placed in Morgan, the same was there temporarily being consumed, or was returned to Walton county in the same or another form, and in the case of manufactured goods all sales were made by the company in its own store or office, or through agents in other States; that it was the right of the defendant to return all of its property, real and personal, in Walton county, where its home office was located on a part of the plant itself; that section 8 of the tax act of 1902 is directed to the taxpayer, and does not change the general law giving the company the right to return its plant in the county of its legal residence; or if it does change the general law, it is contrary to that provision of the constitution which requires general laws to have uniform operation, and prohibits the enactment of a special law in a case for which provision has already been made by a general law (Civil Code,

§ 5732); that the act also violates the constitution (Civil Code § 5883) in that it attempts to provide a different mode of making tax returns, and prescribes different counties in which returns shall be made by corporations owning manufacturing plants located on or across a county line, from that provided in the general law for tax returns of all other corporations or persons owning property on a county line, the effect of which would be to impose additional burdens on the former class of taxpayers. The court disallowed an amendment whereby the defendant sought to set out the provisions of the Political Code, §§ 816, 817, 818, and 826, in reference to the county in which tax returns should be made, with a view of showing that section 8 of the tax act of 1902 was variant from these general laws. To this ruling the defendants excepted. They excepted also to the refusal of the court to allow proof of the allegation in reference to the personal property being only temporarily in Morgan county.

The County of Morgan introduced the tax returns of the manufacturing company, made June 29, 1903, to the tax-receiver of Walton county, from which it appeared that on the day fixed for the valuation the company had real estate, $20,000; machinery, $67,000; merchandise, $4,000; raw material, $34,000; manufactured goods, whether at principal office or in the hands of agents, commission merchants, or others, $3,500; money, $1,500; choses in action, $4,000; mules, $800; wagons, $200. The president of the manufacturing company testified that the manufactured goods were partly in the mill, partly en route to Philadelphia, and partly in Philadelphia. The merchandise was in the store in Walton county. The mules and wagon were in Walton county. Part of the cotton was in Athens, Clarke county, and part in the warehouse, which is in Morgan county. The item "raw material" in the tax return embraces the cotton in High Shoals and in Athens. The merchandise "I should not think was used in connection with the plant, which can be operated easily without the store." The goods are not sold simply to operatives, but to anybody. It is a general store. About a tenth of the goods in the store are manufactured at the plant. The company buys cotton and stores it in Athens; but if it secures enough at High Shoals, it sells that at Athens. It bought the cotton either to manufacture or to sell as it saw fit. It actually used all the cotton embraced in this return

in manufacturing. ∥ The defendants requested the court to charge that the personal property referred to in the act " is such only as may be in or connected with the buildings containing the machinery, and is not personal property outside and not connected with said buildings, or machinery in the buildings. The jury found that the main buildings containing the machinery were in Morgan county, and that the amount of personal property made by and used in connection with or for the purpose of operating the plant was $105,000. Thereupon the court entered a decree that, under existing laws, the manufacturing company shall return and pay taxes upon its real estate, with the buildings and machinery thereon, and on all personal property made by or used in connection with or for the purpose of operating the manufacturing plant, in the county of Morgan, but that its choses in action and like property may be returned either in Morgan or in Walton county at the option of the company ; to which the defendants excepted on the ground that neither the pleadings, nor the evidence, nor the verdict, nor the law of the case authorized that portion of the decree, for that it undertakes to determine in what county the tax returns shall be made, without reference to the changes in the nature, or the uses, or the location of the property. They excepted to the charge that " the act refers to three classes of personal property, — those made by them [the manufacturing company] and on hand at the time ; or those used in connection with operating the manufacturing plant of the High Shoals Manufacturing Company ; or those used for the purpose of operating the High Shoals Manufacturing Company. It matters. not where any of the property included in any one of those three classes was located. It does not matter in which county it was so located, provided it was covered by any one of these three classes referred to in the return required to be made on the 15th of March 1903."

*Henry D. McDaniel* and *John W. Arnold,* for plaintiffs in error. *Samuel H. Sibley* and *George & Anderson,* contra.

LAMAR, J. (After stating the foregoing facts.) Until 1868 the law required that all tax returns should be made where the taxpayer lived. After that date it became necessary to make the return where the property was actually or in fiction located. In order to understand the reasons underlying these contradictory

provisions, and to properly apply the principle to the numerous, though exceptional, cases where land is divided by county lines, it is necessary briefly to consider the history of our tax law. The first tax act of the colony, assented to February 21, 1755 (Georgia Colonial Acts, p. 45), and the first tax act of the new State of Georgia, provided for raising revenue mainly from the imposition of specific taxes. Marbury & Crawford's Dig. 447. This plan was continued under the constitution of 1798, the principal source of revenue still being from specific taxes on land, which was classified into pine and hickory, lowland and upland, and, without regard to its value, made subject to a specific tax of from one mill to three cents per acre. Town lots and certain forms of personal property were, however, taxed ad valorem. Cobb's Dig. 1044. Notwithstanding this want of uniformity, the system was continued until 1852 (Acts 1852, p. 288), when the first ad valorem tax act was passed. Under both systems, however, the act of 1804 was the model and basis of our tax legislation. It was but a reenactment of previous statutes of the same character, and was annually revised and reenacted, and finally made perpetual. Considering the difference in conditions, and the diametrically opposite theory of making assessments of valuations, it is a remarkable fact that this act of 1804, at the end of a full hundred years, furnishes the methods, books, returns, officers, and framework of our present machinery for collecting revenue. Under that act all returns were to be made in the county wherein the taxpayer resided. Cobb's Dig. 1045 (4). Compare Pol. Code, § 826. But in considering this provision it must be borne in mind that the word "tax" or "taxation" was not to be found in the constitution of 1798, and that as to that subject the General Assembly was then almost as untrammeled as the English parliament, and could legislate at will as to rate, locality, method, subject, and object of taxation. It is also to be noted that this act and its renewals related to the assessment and collection of State tax. If there ever had been any general laws on the subject of county taxes, they were all expressly repealed by the act of 1796. Marbury & Crawford's Dig. 171 (3), 172 (6); Cobb's Dig. 183 (4). Prior to 1823, the revenue for county purposes was derived from licenses, fines, and the sale of public lots. Pol. Code, § 420. The power to levy a "tax extraordinary of the general tax" was made perma-

nent in 1821, and in a slightly modified form has been carried forward to the Political Code, § 399.   But this power to collect extraordinary taxes was evidently only resorted to by counties in rare instances.   Taxes were levied generally and primarily for State purposes, and were all covered into the State treasury.   Beginning with 1823, the practice obtained of providing that one half of the tax collected "shall be paid to the treasurer of the State, and the other half to the inferior courts of the respective counties."   In some years the General Assembly even provided that the county might retain the entire State tax.   Marbury & Crawford's Dig. 163 (4), 167 (11); Dawson's Compilation, 417–421; Acts 1835, p. 281.   From this it will be seen that the scheme of the original and perpetuated act of 1804 was to collect State taxes.   There was, therefore, no violation of policy or principle in requiring returns to be made and taxes to be paid where the owner lived. Even if the land was in a different county, it was yet within the State, and within the territorial limits of the authority levying and collecting the tax.   And when, after 1838, county taxes began to be generally collected, the existing system as a whole was, without question, and by mere reference, made applicable to the return and collection of county taxes.   Whatever might be said as to the policy of collecting taxes on land in a county other than that in which it was located, no issue was raised on the subject; there was no constitutional provision to make it unlawful, and the former rule applicable to State taxes was left in full force, that all property should be returned where the owner lived.   Exceptions were made by the Acts of 1840, 1847, and 1855, codified in sections 756a, 760 of the Code of 1863 (Pol. Code, §§ 816, 817, 821), by which the returns of mining companies were to be made in the county where the mine was located.   Plantations, with the stock and other property thereon, were to be returned in the county where the plantation was situated. If the mine or plantation was on a county line, the return must be in the county where most of the improvements lay.   If the line was uncertain — and afterwards as to wild lands (Pol. Code, § 821) — the owner might elect in which of the two counties the return should be made.

1–4. This was the state of the law when the constitution of 1868 (Code of 1873, §§ 5019, 5020) for the first time imposed limitations on the legislature in respect to the subject of taxation,

and granted the power of taxation to counties, "to be exercised within their several territorial limits." This necessarily involved a reversal of many old practices, and as thereafter counties could only exercise the taxing power within their "territorial limits," it was manifest that, at least so far as county taxes were concerned, the residence of the owner became immaterial, and that the physical or legal situs of the property in the taxing district became not only important but jurisdictional. Hence the requirement in the act of 1872 (Pol. Code, § 820) that all lands subject to taxation shall be returned by the person owning the same to the tax-receiver of the county where the land lies. But there were instances in which the property was not wholly within the "territorial limits of the authority levying the tax" (Civil Code, § 5883), but partly within one and partly within another county. Yet by reason of the fact that the property was a unit in value, it was necessary that it be returned and taxed in solido. The discovery of new forms of power have multiplied the number of such cases, in which a single unit or property may lie within more than one jurisdiction. Railroads and telegraph and telephone lines extend from county to county and from State to State. Valuable private bridges span streams forming the boundaries of States or counties. Canals and systems of waterworks may have their excavations and mains in more than one taxing district. Mines, plantations, and city lots may be divided by county lines. Manufacturing companies may not only have their real estate divided by county lines, but the dams which help to create the water-power may be built across streams which separate counties, or across rivers which are the boundaries between sovereign States. It is evident that what constitutes the center of the unit varies in each particular class. In the case of a plantation it may be the dwelling, and buildings within the curtilage. In the case of a canal (Acts 1902, p. 29, § 8) or railroad there may be no center; but having long lines, with rolling stock extending for great distances in several jurisdictions, the taxes thereon may be capable of easy and exact apportionment on a basis of mileage. In the case of mining companies the mine is naturally the main element of value. In a manufacturing plant the factory could be treated as the heart of the enterprise, supplying value to the contiguous parts. (Acts of 1902,

p. 28, § 8.)    But as to outlying lands across the line, it would not be easy to determine the value of the parts.    The same is true in reference to a plantation, where the land may be of a diverse character and of different value for purposes of cultivation, or where some may be forest, waste, or incapable of cultivation.    In neither case would it always be practicable to make a fair apportionment of the tax money between the two jurisdictions by dividing the whole by the number of acres or square feet.    But all these classes of county-line property form exceptional cases not within the letter of the constitution, and therefore to be dealt with by the General Assembly.

In some States this right to require the return and tax in one county is sustained on the theory that the county line is by the tax statute changed, so as to take the divided tract wholly into one of the taxing districts.    Cooley on Taxation, 251.    But this is a mere fiction.    The fact is that while indivisible property may as such be returned in one county or the other, the constitution does not provide in which county it shall be.    The matter is therefore relegated to the lawmaking power, for the constitution is silent as to where returns shall be made.    In fact, so far as the present record is concerned, the contention of both the parties must be based on the right of the General Assembly to make such a requirement.    There is no claim that there is a want of uniformity in thus taxing county-line property ; and neither party insists upon an apportionment of the tax collected.    The County of Morgan contends, however, that the main building and machinery constitute the heart of the enterprise and give value to the outlying property across the line in Walton, and that it was therefore within the power of the legislature to require the return to be made and the taxes to be paid in the county where this main building was situated.    On the other hand, the manufacturing company and the County of Walton insist that the fact of the taxpayer's residence is of controlling importance, and that the return must be made and the tax paid where the principal office is located ; and that the contrary provision in section 8 of the tax act of 1902 is unconstitutional, because it varies the general law contained in the Political Code, § 826, that " all other companies or persons taxed shall make their returns to the receiver of the respective counties where the persons reside or the office of the

company is located." But, as shown, that section, in view of the act of 1872 (Pol. Code, § 820) and the constitutional requirement as to "territorial limits," can now have no reference to real estate in general, nor to real estate divided by county lines. There is, therefore, nothing in this section which prevented the legislature from fixing the county in which a manufacturing plant divided by a county line should be returned.

5–8. But while section 826 does not apply to real estate, it is important in determining where the returns of the company's personal property should be made. Except special provisions in the Political Code, §§ 816, 819, and in the tax act 1902, §§ 15, 6 and 8, as to non-residents, property on plantations, building associations, and water craft, section 826 is the only law regulating the place where personal property is to be returned. While there may be some instances, as in the Political Code, § 819, where the rule may not work well, yet generally it has been found more effective than any other for collecting the tax due by residents on personal property out of the State and on scattered personalty which would likely escape the notice of the tax-receiver in the several counties of the State in which tangible property might be located. And therefore this provision of the act of 1804 has been in effect continued to the present day. While the situs of choses in action for taxation has been several times considered, no case involving the situs of tangible personal property has ever been before this court. In the absence of a statute, the rule, of course, is that personalty is to be taxed where the owner resides. Under general laws the legislature may no doubt make a classification not arbitrary, and fix the situs of tangible or intangible personal property. By such general law it might declare that all stock and property on farms may be taxed where the plantation is situated; that all improvements, fixtures, machinery, or personalty attached to or used therein may be taxed with the factory; that all property used in a store may be taxed where the business is conducted; and that personal property of a non-resident may be taxed where the same is found. And there may be need of legislation on the subject. But in view of the provision of the constitution, that taxes must be collected under a general law, it could not provide that cotton or merchandise, or other personal property dissevered from real estate, belonging to individuals,

should be taxed in one county, and the same class of property belonging to a corporation should be taxed in another county.    If such personal property of one taxpayer is to be returned where he lives, the same sort of property of another taxpayer must be returned where he lives.    Or if the physical situs should be treated as controlling, and the personal property of A is to be taxed in every county in which it is found, the same rule must be applied to B.    In the present case the manufacturing company had personal property in four jurisdictions,—in Morgan, Walton, and Clarke counties, and outside of the State.    Some of this personal property, on March 15, 1903, was dissevered from the mill; and while the fact that the plant was divided by county lines did affect the question as to where that plant, and property physically connected and used therewith as a part thereof, should be returned and taxed, yet as to property not actully connected therewith the county line created no basis for classifying personal property that was in fact movable and not connected with the factory.    The division of the plant made it uncertain as to what was the territorial limit in which the tax should be collected.    But the existence of a county line through the land did not per se affect the cotton in Philadelphia, or in Clarke county, or any dissevered personal property in Walton or in Morgan.    The line created no more of a separate class as to these dissevered articles than it did as to notes and accounts.    Nor was the question as to where such personalty should be returned in any way affected by the fact that the goods had been manufactured by the company, nor by the use to which the cotton might be put after March 15, 1903.    The source and intended uses of the property did not put it into a class by itself, but left it to be returned in the same way as similar property would be returned by other taxpayers.    Without passing upon any question not directly presented by the record, and not considering any question as to uniformity or want of uniformity, or as to the classifications which have been made or can legally be made, it is sufficient to say that the plaintiffs in error were at least entitled to a charge which would construe section 8 of the tax act of 1902 so as to require the return of personalty dissevered from the plant in the county where the principal office was located.    Without considering each of the several assignments seeking to raise this point, it is sufficient to say that the

plaintiffs in error excepted to the refusal to allow evidence on this line, to the refus.. to charge written requests on this subject, and also excepted to the charge actually given, which in effect made it incumbent upon the jury to find that all property other than notes and accounts must be returned in Morgan county.

9. From the foregoing it follows that the petition was not demurrable. The act of 1903 (Acts 1903, p. 16) of course could not change the rights of any parties which had previously attached, or give an effect to a return which it did not already have. But it was perfectly competent for the legislature thereby to frame a remedy by which any disputed issue of fact or right might be settled. In the previous litigation between these parties their position was reversed in this court, and the question now presented was not decided. In *Penick* v. *High Shoals Co.*, 113 *Ga.* 592, there was no question of a county line. In *Penick* v. *High Shoals Co.*, 116 *Ga.* 819, a manufacturing plant located across a county line was required to be returned where the greater part in value of its plant was located. There was nothing to indicate whether the water-power, the real estate on which the operatives resided, the principal building, or the office from which the business was directed constituted this main value; and it was held that the taxpayer's return under oath in a particular county was to be treated as conclusive. That decision construed the act of 1900, which is no longer of force. The act of 1902 not only requires the return to be made where a particular building is located, but the officer's return is no longer conclusive, since there is now a method provided, under the act of August 17, 1903, which permits a bill in the nature of interpleader between the two counties and the taxpayer by which any dispute as to where the main building is located may be settled.

*Judgment reversed. All the Justices concur.*