SUTTLES, tax-collector, *et al. v.* NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY.

No. 13904.   FEBRUARY 16, 1942.   REHEARING DENIED MARCH 16, 1942.

*Spalding, Sibley, Troutman & Brock, E. Harold Sheats, W. S. Northcutt, Standish Thompson,* and *Harvey Hill,* for plaintiffs in error.

*MacDougald, Troutman & Arkwright,* contra.

*Julius A. McCurdy, Granger Hansell, J. L. R. Boyd,* and *W. J. Parker,* for persons at interest, not parties.

BELL, Justice.   (After stating the foregoing facts.)

■   According to the evidence, the assessments were made on December 31, 1937, while the executions were not issued until

April 3, 1940; the delay in issuing them being due perhaps to arbitration and other proceedings. See *Gilbert* v. *Northwestern Mutual Life Insurance Co.,* 189 *Ga.* 766 (8 S. E. 2d, 43) ; *Gilbert* v. *Northwestern Mutual Life Insurance Co.,* 62 *Ga. App.* 843 (9 S. E. 2d, 98). The assessments were based on credits arising from loans made by Northwestern Mutual Life Insurance Company on real estate in Fulton County, and existing in its favor during the years 1931-1937, inclusive. There were seven assessments, one for each year, and seven executions, amounting in all to more than $200,000, including principal, interest, and penalty. Substantially, the only issue in the court below was whether the credits had a situs for such ad valorem taxation in Fulton County, or, as we might say, in this State, and the composite question here is whether there was any evidence to support the finding or verdict of the judge resolving the issue in favor of the insurance company.

The contention of the tax officers is twofold. It is insisted, first, that the loans were made in connection with a life-insurance business conducted by the plaintiff company in Fulton County, and that this alone made the credits taxable; but it is contended further that even if the loans were entirely separate from that business, the credits were still derived from a loan business conducted in the county through a resident agent, and were thus so localized as to render them taxable in this State.

The first branch of this contention may be disposed of in a very few words. Under the maxim *mobilia sequuntur personam,* such intangibles would ordinarily be taxable only in the State of the owner's domicile. Moreover, there would be no jurisdiction to tax them in a different State, unless they were connected substantially with some business of their non-resident owner in such State. *Columbus Mutual Life Insurance Co.* v. *Gullatt,* 189 *Ga.* 747, 750 (8 S. E. 38) ; *Suttles* v. *Associated Mortgage Companies,* 193 *Ga.* 78 (17 S. E. 2d, 272). As to this, the evidence showed without dispute that the loans were made through an entirely different channel from that through which the company issued its insurance contracts, and were placed here merely as a part of its general investment policy, with no particular reference to the life-insurance business done by it in Georgia. While it does appear that these investments were made for the purpose of producing income and thereby enabling the company to perform its insurance

contracts generally, and in this sense they may have constituted an incident of its Georgia insurance business, yet, so far as shown, the connection was not different from that which existed between such investments and the whole mass of its insurance business, wherever placed; and this alone would not establish a tax situs, so as to render the credits taxable in this State. The loans were not made to policyholders as such, and the fact that an applicant for a loan may have been a policyholder did not, according to the evidence, have any bearing on the transaction. Nor does it appear that the company in making such loans complied or sought to comply with the Code, § 92-2510, providing for reduction of tax on premium receipts, on account of investments made in this State. Under the facts appearing, the credits arising from the loans were not taxable in Georgia merely upon the theory that they were a part of an insurance business conducted by the lender in this State.

■ But even if the loans were made in a separate and distinct business, the credits were subject to taxation in this State if they arose out of a *loan* business conducted here. As to this question the evidence, though voluminous, may be summarized as follows:

E. M. Durant, a witness for the defendants, testified: In the year 1900 he was employed by the Northwestern Mutual Life Insurance Company as loan agent in Georgia, to solicit applications for mortgage loans, and continued in such employment until some time in the year 1938. Most of the loans placed by the company were made on his solicitation. He was at all times paid a salary, and received no other compensation. The witness maintained an office in Atlanta known as the loan office, and the company had no other loan representative in Georgia. This office was rented by him in his own name, but the rent was paid by the company on an expense account. This account was in addition to his salary, and included telephone, stenography, and other clerical expenses. The company desired large loans only, making no loan under $2,000. The witness solicited and received a number of applications for loans, addressed to the company or its finance committee, which he forwarded to the company at its home office in Milwaukee. With each such application he would make a personal report or recommendation, stating his opinion as to the moral risk and the value of the proferred security. So far as he knew, no other appraisal or inquiry was made as to these matters. The applica-

tions would be either accepted or rejected by the finance committee at the home office, though in most instances they were accepted; some, however, with modifications. Practically all communications between the company and an applicant before a loan was made passed through the office of Durant in Atlanta, and the same was true of subsequent communications other than remittances made in payment. When an application was accepted, the company required that an abstract of title be prepared and furnished by an attorney selected and compensated by the applicant, provided only the company must be satisfied as to the character and ability of such attorney. Abstracts of title thus prepared would be delivered to Durant and forwarded by him to the home office, and were subject to approval only by the attorneys for the company there, but notice of approval and other communications regarding them passed in like manner through his office. All notes and loan deeds were prepared at the home office and mailed to Durant for execution by the applicants in Fulton County, and after being so executed were returned by him to the home office for final approval. If the papers in a case were then found to be in proper form, the security deed would be mailed back to Durant with a check payable to the applicant for the amount of the loan. He would first have the loan deed recorded, and then deliver the check as directed. After such record, the deed would be returned to the lender in Milwaukee. Before loans were closed, insurance upon buildings was usually required. Policies of such insurance were obtained by the applicant in Atlanta and were accepted by Durant in behalf of the company without previous submission to it. He knew what insurance companies were satisfactory to the company; and where a policy was issued for the required amount by one of such companies, he would then deliver check to the borrower and forward the insurance policy afterwards. In final instructions there might also have been "some little things" regarding title that had to be cleared. These were "taken care of" by the borrower's attorney before the check was delivered. In such case the attorney would give Durant a certificate that these "clearances" had been made. When he received this certificate, he would deliver the check without referring the matter to Milwaukee.

Where borrowers were required to assign leases on buildings, communications as to these also passed through Durant's hands.

The same was true as to extensions of loans already made, several having been extended. He had no authority to say whether an application for a loan would be accepted or rejected, or to make any decision as to the rate of interest, or as to other terms or conditions, and in all matters and instances was required to follow instructions specifically given. After a loan was made, the note or notes and the security deed were at all times kept by the company at its home office in Milwaukee, and payments were generally made directly to that office. In some cases borrowers would deliver checks to Durant for transmission to the company, but in such cases the checks would be made payable to the company, as he had no authority to indorse checks or handle the company's money. None of the checks issued by the company in closing loans were drawn upon banks in Atlanta, as the company kept no funds in Atlanta or elsewhere in Georgia from which loans could be made by any one. Formerly maturity notices were mailed to borrowers directly from Milwaukee, but during the last three years of Durant's employment such notices were mailed to him at his office in Atlanta, and he in turn sent them to the borrowers. His instructions as to these matters were given to him in the form of a circular letter sent to all loan agents. Also, during the same period, he was required to notify borrowers of expirations of insurance policies on buildings. In case of delay in furnishing a renewal policy, he would take the matter up with the borrower or property owner. Sometimes renewal policies would be delivered to him, and at other times they would be mailed directly to the company. In the few cases where a borrower failed to pay principal or interest promptly, Durant would on instruction from the company contact the borrower and endeavor to have the default remedied.

Before 1929 Durant was a full-time employee, although he testified that his activities did not require any considerable amount of work, and until then there was only an oral contract between him and his employer. During that year his employment was placed on a part-time basis, under a written contract providing as follows:

"That the company hereby employs the said Edward M. Durant as its part-time loan agent in charge of the company's city loan field, now having its established office at Atlanta in the State of Georgia, subject nevertheless to change of location or of field from

time to time at the pleasure of the company, such employment to be for a term beginning on the first day of April, 1929, and continuing until terminated by the giving at any time of thirty days prior written notice thereof by either party to the other. The said loan agent agrees to observe all rules and regulations of the company, and that he will devote to the best interest of the company, so far as may be reasonably necessary, in its judgment, his time and attention. The said loan agent, subject, however, at all times to the direction of the finance committee or the president, agrees to faithfully perform all such duties and obey all such orders and instructions in any way connected with or pertaining to the said mortgage loan business of the company as may be assigned or given by any official of the company in its loan department within the scope of his authority. He shall hold and preserve as the property of the company, subject to its order, all blanks, stationery, correspondence, books, files, records, documents, and all other property in his possession or under his control connected with or in any way pertaining to the business of the company, and shall promptly surrender the same to the company or to whomsoever it may direct upon termination of this agreement.

"The company agrees and binds itself, in consideration of the faithful performance of his duties under this agreement, to pay said loan agent a salary at the rate of $3,900.00 per annum, payable in equal monthly installments during the term of this agreement, and to reimburse for all reasonable necessary expenses incident to his said employment. The company further agrees that once every month it will advance to said loan agent such sum of money on account of his expenses as it shall deem reasonable, including all salaries and office rent."

A new contract was executed in 1933, substantially in the same form, except as to salary, which was increased to $5,000. Durant testified that under this agreement he was returned to full-time employment. The change back to full time happened about the time he took over the management of a building on which the company had a loan that was in default. He managed this building "just like the owners manage other buildings in Atlanta." From 1930 to the end of his service in 1938, he was required to obtain and furnish information as to payment of taxes by borrowers. During the period of his service the company made nineteen loans

that were still outstanding in 1931, varying in amount from $3,500 to $1,500,000, all secured by real estate in Fulton County. Only two were less than $25,000. All of these loans were made before the year 1928. Generally they were long-term loans, ranging from five to fifteen years. Durant testified that he had not solicited any application for a loan since 1928, and that since that time the company had not made a new loan in Georgia. It appeared from his testimony, however, and from documentary evidence, that six of the original loans were renewed, or extended, to wit, one in each of the years 1931, 1932, 1933, 1935, 1936, and 1937, some being reduced in amount. Also during this period various leases were assigned to the company by the borrowers.

On January 1 of each of the years for which the assessments were made, that is from 1931 to 1937 inclusive, the total amount of the loans or credits outstanding in favor of the company on the original and renewed contracts exceeded $4,000,000, and the smallest number of loans outstanding in any one of these years was thirteen. Durant kept no books or records of any kind other than files of correspondence.

Sam T. Swansen, as a witness for the company, testified substantially as follows: Beginning in 1916, witness has served the company in the capacities of attorney, assistant counsel, and assistant general counsel, has been general counsel since 1930, and is personally familiar with its business operations. The company was incorporated under the laws of Wisconsin. Its board of trustees and its president, treasurer, secretary, and general counsel reside in Milwaukee, where all meetings of the trustees and officers are held and all of its books and records are kept. During the period in question, as at all other times, all contracts and commitments of any kind in regard to the company's business were subject to approval or rejection solely by the officers of the company at its home office in Milwaukee. With particular reference to the loans in Georgia, he testified, as did Mr. Durant, that no officer or agent had any connection with the solicitation of these loans, other than Durant. No loans were made from any funds kept in Atlanta, and no person on behalf of the Northwestern had authority to accept or reject an application, other than the finance committee at the home office. The money was disbursed by check issued by the home office on a bank in Chicago or New York, as

the borrower might prefer; and all notes, both as to principal and interest, were payable at the home office of the company in Milwaukee. The notes and loan deeds were prepared at that office and forwarded for execution. After being so executed and after the deeds were recorded, all of these instruments were kept at the home office until paid in full in accordance with their terms, or forwarded to an attorney for collection or foreclsure. The notes, loan papers, and abstracts of title which the borrowers were obligated to furnish were in all instances passed upon and approved in Milwaukee.

The testimony of Swansen, especially in view of unquestioned documentary evidence, can not be reasonably construed as contradicting the evidence of Durant *as to any matter of fact.* Indeed the foregoing summary of his evidence accords generally with that contained in the brief filed for the company in this court, and we do not understand that there is any contention in reference to a conflict. Anyway, as we construe his evidence, its main purpose was to show clearly or emphasize that management and control in reference to all matters were vested solely in the officers of the company in Milwaukee, and were at all times exercised exclusively by them. Durant did not testify to the contrary, nor was there conflict in reference to other matters. It is true that in one statement by Swansen, he referred to "applications . . submitted by the prospective borrowers to the Northwestern Mutual Life Insurance Company at its home office in Milwaukee, Wisconson." But even in this instance he evidently had reference to submission through Durant, as he nowhere contended that the latter was not employed as "loan agent," and in that capacity solicited and submitted applications. In the brief filed for the company, it is suggested that Durant acted solely as a "funnel" for this purpose; and that, his duties being entirely ministerial and calling for no act of judgment, the company did not conduct a loan business through him so as to fix a tax situs in this State. We consider the entire evidence, oral and documentary, as telling a clear and consistent story, and will decide the case accordingly.

We think the evidence demanded a finding in favor of the tax. We are concerned here with a tax on intangibles, a subject about which there are innumerable decisions, many of which have been cited in the briefs; and while all of the cited cases and some others

have been carefully examined, the question presented is a very narrow one, and we shall endeavor to avoid collateral discussion.

First, let us look at certain of our State laws, constitutional and statutory, in reference to taxation. The constitution of Georgia (Code, §§ 2-5002, 2-5003), after enumerating several classes of property which may be exempted from taxation, declared further (Code, § 2-5005) that "all laws exempting property from taxation other than the property herein enumerated shall be void." The Code, § 92-101, provides that "all real and personal property, whether owned by individuals or corporations, resident or non-resident, shall be liable to taxation, except as otherwise provided by law." Section 92-102 declares that for the purpose of taxation personal property shall be construed to include, among other things, "moneys, credits, and effects, whatsoever they may be," and "money due on open account or evidenced by notes, contracts, bonds, or other obligations, whether secured or unsecured." Section 92-105 provides that "Lands or other property belonging to citizens of the United States, not residents of this State, shall not be taxed higher than the property of residents, but such non-residents, whether their property in this State is real or personal, shall pay taxes on the same herein." Thus, apart from the permitted exemptions, the constitution evinces an intention that no property which is subject to taxation in this State shall be relieved therefrom, and the statutes quoted express with equal certainty an intention by the lawmakers to lay a tax upon all property of every kind or class which the State of Georgia has jurisdiction to tax, nothing excepted. *Georgia Railroad & Banking Co.* v. *Wright,* 125 *Ga.* 589 (54 S. E. 52). Compare Wood v. Ford (Fla.), 3 So. 2d, 490, as to Florida statutes.

We have already adverted to the rule that movables are usually taxed at the domicile of the owner; but there may be exceptions, depending on the circumstances.

A State of course can not tax property wholly beyond its jurisdiction. Any effort to do so would be in violation of the due-process clause embodied in the fourteenth amendment, as well as the similar provision of our State constitution. Union Refrigerator Transit Co. v. Kentucky, 199 U. S. 194 (26 Sup. Ct. 36, 50 L. ed. 150) ; Safe Deposit & Trust Co. v. Virginia, 280 U. S. 83 (50 Sup. Ct. 59, 74 L. ed. 180). But, except as thus limited, it is the

declared policy of this State to levy a tax upon all property. In several decisions by this court it has been held in effect that intangible property of a non-resident may be taxed in this State only if it is derived from or is used as an incident of property owned or a business conducted by such non-resident or his agent in Georgia. *Columbus Mutual Life Insurance Co.* v. *Gullatt,* 189 *Ga.* 750 (supra) ; *Suttles* v. *Associated Mortgage Companies, Inc.,* 193 *Ga.* 78 (supra) ; and see *Collins* v. *Miller,* 43 *Ga.* 336 ; *Carhart* v. *Paramore,* 44 *Ga.* 262 ; *Cary* v. *Edmondson,* 44 *Ga.* 651.   But the rulings to this effect are but definitions of what is deemed to be necessary to jurisdiction in such case, or, in other words, to authorize taxation consistently with the due-process provisions.   They do not purport to draw a different line anywhere on this side of the constitutional fence, but do recognize that barrier, at least impliedly, and evidently intend conformity therewith.

The fact that the debtors resided in this State would not, without more, confer jurisdiction to tax.   Conversely, the fact that the notes which were executed as *evidence* of the loans were at all times kept in Milwaukee does not prevent taxation here, provided the other facts and circumstances were such as to bring the resulting credits within the State's power.   It appears from the record that the assessments were not made upon the notes themselves or the security taken therefor, but were founded on the credits arising from the loans, in favor of the creditor.   That such *credits* may constitute a species of property different from the notes seems to be well settled.   Even if the notes were destroyed, the debts would still exist.   See, in this connection, Metropolitan Life Insurance Co. *v.* New Orleans, 205 U. S. 395 (27 Sup. Ct. 499, 51 L. ed. 853) ; Buck *v.* Beach, 206 U. S. 392 (27 Sup. Ct. 712, 51 L. ed. 1106) ; Liverpool & London & Globe Insurance Co. *v.* Board of Assessors, 221 U. S. 346 (31 Sup. Ct. 550, 55 L. ed. 762).

In numerous decisions by the United States Supreme Court it has been held that choses in action will acquire a situs for taxation in a State other than the State in which the owner is domiciled, if they become integral parts of some local business conducted by him or his agent.   Compare Metropolitan Life Insurance Co. *v.* New Orleans, 205 U. S. 395 (27 Sup. Ct. 499, 51 L. ed. 853) ; Buck *v.* Beach, supra; Wheeling Steel Corporation *v.* Fox, 298

U. S. 193 (56 Sup. Ct. 773, 80 L. ed. 1143). In such case the local laws give validity and effect to the credits, provide the means of enforcement, and protect the business of the owner. Under such circumstances the State is entitled to demand a tax for its own support and existence, in return for the advantages afforded. Where, under the facts of a case, such advantages are enjoyed, either actually or potentially, the State may within its territory impose a reciprocal tax without exceeding its jurisdiction or violating due process. Curry *v.* McCanless, 307 U. S. 357 (59 Sup. Ct. 900, 83 L. ed. 1339, 123 A. L. R. 162).

It is proper to say in this connection that the foregoing general principles as to situs and jurisdiction are fully recognized by counsel on both sides, and the real controversy concerns their proper application. Counsel for the plaintiffs in error, the tax officers, contend that under these principles the evidence shows without dispute, and as a matter of law, a tax situs in this State, while counsel for the defendant in error maintain the contrary. In particular, their greatest difference, it seems, arises from the fact that all discretion and authority were vested in the officials at the home office, with action elsewhere only upon specific instructions; the legal significance of these circumstances being the line of cleavage. It is contended on the one side that even though Durant may have been a mere special agent with no authority whatever to make a loan or to transact other business for the company except as expressly directed, yet the company did actually negotiate and finally consummate each loan through him as its agent, and that in such case it is immaterial where the decisions were made, since they were ultimately put into effect in Fulton County only through Durant as resident agent, and thus constituted business transacted by the company. On the other hand, it is insisted that since Durant was the mere channel through which the company conducted business with resident applicants and borrowers, all management and control being exercised by the officers in Milwaukee and there only, the transactions were never localized in Georgia, so as to fix a tax situs within the principles to which we have alluded. It is pointed out that the agent could make no loan or any decision regarding a loan, that checks for loans were always drawn upon banks in other States, that all notes were payable in Milwaukee, that the company had no funds in Georgia constituting

stock in trade, that no money was ever delivered to an applicant by the agent, and that in all respects his duties were ministerial and strictly limited.

Every case of this general type must depend on its own particular facts, because situs can be determined by facts and by these only. If the company had placed money at the disposition of Durant and authorized him to make loans therefrom in his own discretion, there would, of course, be no contention that the choses in action resulting therefrom in the company's favor would not be taxable in this State. But we are unable to agree that the physical location of the managing authority, or the place from which it may emanate in particular transactions, must be deemed controlling on the question of taxable situs. It is true that in every instance the company's mind, so to speak, was made up in Milwaukee, but it is equally true that it was never expressed to the applicant or borrower except in Fulton County, and then through the company's representative as loan agent. The notes and security deeds were in all cases executed in Fulton County and delivered to Durant for transmission to the company; and when the loans were ready to be closed, checks were delivered by him to the applicants on behalf of the company. All incidental communications passed through him, and he was the first and final instrumentality through which the company acted in Georgia or in Fulton County, in making these investments, and we think it is immaterial that he was limited and could do nothing except what he was specifically told to do. *The fact remains, that all contracts actually came into life in that county, though authorized elsewhere.*

While the checks themselves were not money, they were choses in action and were the equivalent of money to the borrower; also to the lender. The case would not be different if the company had in each instance sent a bag of money to be delivered by Durant to the borrower; and if that had been done, we think the company would have been doing business in Georgia, and none the less so, from a legal standpoint, than if all that might have been so used had been sent to him in one lot, for delivery from time to time, on particular instructions as loans were made. Again, since Durant was the agent and instrumentality through which each particular loan was closed, it would seem to be immaterial that he acted in each case on particular instructions, instead of having

authority granted in bulk, to do the things that he ultimately did in the company's behalf. Whether he received his instructions line by line and followed but one line at a time, what he finally did was the company's act, and the net result is that it made loans in Georgia through him. The company has received the same protection and advantage from Georgia laws that it would have enjoyed if complete authority had been vested in such agent, and to annul the present claim on the ground asserted would be placing form above substance; whereas "taxation is an intensely practical matter" and should not be determined on such basis. Farmers Loan & Trust Co. v. Minnesota, 280 U. S. 204 (50 Sup. Ct. 98, 74 L. ed. 371) ; Commissioner of Internal Revenue v. Winslow, 113 Fed. 2d, 418, 133 A. L. R. 405.

If the place where the management resides and from which it is projected should be allowed to control on the question of situs, it would seem to follow that in practically no case would credits arising from business transacted through a branch office or place of business situated in a different jurisdiction be subject to tax by the local authorities, because in all such cases the resident or local agent would still be subject to control by his principal, whether a special or a general agent. It is not believed that the great organic principles invoked would make the mere quantum of the agent's authority a controlling factor. We think they would declare that where a non-resident does in any manner actually conduct business in this State through a local agent, he can not deprive the State of its authority to tax by limiting the authority of such agent. Compare Tyler v. United States, 281 U. S. 497 (50 Sup. Ct. 356, 74 L. ed. 991).

As to relationship, the credits were not merely integral parts of the local business, but were just about the essence of it, being the very objects of such business. Accordingly, there can be no difficulty from the standpoint of integration.

And if under the facts of the case a tax situs did otherwise exist in Georgia as to such credits, it would be immaterial whether they arose in interstate commerce, since the commerce clause does not exempt either tangible or intangible property from a non-discriminatory ad valorem tax by a State (Virginia v. Imperial Coal Sales Co., 293 U. S. 15, 55 Sup. Ct. 12, 79 L. ed. 171), nor would it matter that the same intangibles might also be subject to taxation

in the State of the company's domicile. Curry *v.* McCanless, 307 U. S. 357 (supra).

This court has previously had before it at least three cases similar on principle to the one at bar. *Armour Packing Co.* v. *Savannah,* 115 *Ga.* 140 (41 S. E. 237) ; *Armour Packing Co.* v. *Augusta,* 118 *Ga.* 552 (45 S. E. 424, 98 Am. St. R. 128) ; *Armour Packing Co.* v. *Clark,* 124 *Ga.* 369 (52 S. E. 145). In each instance the credits of the non-resident corporation were held taxable in this State. Only the last of these cases will be noticed further in this connection. The facts were succintly stated in the headnote as follows: "A New Jersey corporation with its principal office in Missouri had also a place of business in Richmond County, Georgia, in the charge of an agent of limited authority. The goods used in the business were shipped to Augusta from the Missouri headquarters, and were then sold, either in broken or unbroken packages. Some of the sales were on credit, and to parties living both in Georgia and South Carolina, the notes taken in the course of the business being forwarded to the principal office and paid either there or through the Augusta agency; and when the notes and accounts were collected in Augusta the amounts realized were sent immediately to the principal office." It was held that these notes and accounts were subject to State and county taxation in Richmond County. In that case the company alleged in its petition that the agent in charge of the Augusta business was clothed with no discretion whatever, had no right to purchase property to be used in said business or to exercise a general management of the same, but was simply an employee of the packing company and acted in all matters pursuant to instructions received from it. In the decision by this court it was stated: "We do not lose sight of the fact that, according to the allegations of the petition in this case, the authority of the plantiff's agent . . is much more restricted than that of the agent in the case from which we have quoted [*Armour Packing Co.* v. *Augusta,* 118 *Ga.* 552, supra] ; but we fail to see that this alters the principle involved in any degree. The plaintiff shipped its meats from Kansas City, but its business was conducted in Augusta. Its agent had only a limited authority; but there is no escape from the important fact that, regardless of any considerations as to the point from which it obtained its stock of goods or the extent to which its agent was authorized to

act for it, the plaintiff was engaged in conducting a business in the City of Augusta, and in the conduct of that business the fact of his [its] non-residence gave him [it] no more favored position than that occupied by resident dealers of like character." In that case the subject-matter consisted of meat or food products. These products were shipped to the Augusta agency and there stored in bulk until sold by the resident agent; but, as indicated above, this fact as to keeping in stock does not distinguish that case from the one at bar, on legal principles. In neither case was the assessment made on physical property constituting stock in trade or upon anything else intended for bargain or sale by the resident agent; that is to say, in the packing company case, the tax was not levied on the meat or food products kept in Richmond County, and in the instant case there is no levy on money or its equivalent as physical property kept in Fulton County. In that case the tax was levied on the notes and accounts arising from sales. Here it is on credits arising from loans. While the authority of Durant in regard to these loans may have been even more restricted than was the authority of the agent in the Augusta or packing company case, the cases, in our opinion, are substantially identical, so far as tax situs is concerned. On authority of that decision, as well as decisions of the United States Supreme Court, we hold that the credits here in controversy had a situs for taxation in Fulton County, and that enforcement of the challenged assessments and executions would not be contrary to the guaranty of due process as expressed either in the fourteenth amendment or in the constitution of this State. We do not construe the decision in Wheeling Steel Corporation v. Fox, supra, as deciding anything contrary to this conclusion, and the same statement will apply to the other decisions by that court which have been cited for the defendant in error. While it is true we find no decision of the United States Supreme Court based on identical facts, yet from pronouncements made by it in the cases cited, construing the fourteenth amendment as related to jurisdiction and tax situs, we think the present case could be decided no other way, consistently with constitutional principles. See especially Metropolitan Life Insuranc Co. v. New Orleans, Liverpool & London & Globe Insurance Co. v. Board of Assessors, and Curry v. McCanless, supra.

Also, the conclusion which we have reached is in perfect harmony

with our own recent decision in *Suttles* v. *Associated Mortgages Companies,* 193 *Ga.* 78 (supra), where the choses in action had passed by transfer from the original holder into the ownership of a non-resident, which did not at any time use them in this State, except for purposes looking to their collection. Nor was there any ruling to the contrary in *Columbus Life Insurance Co.* v. *Gullatt,* 189 *Ga.* 747 (supra), where the decision was based on pleadings alleging no situs.

Counsel for the company rely in part on the Code, § 92-6208, providing as follows: "All persons, companies, and corporations . . conducting any business enterprise upon realty not taxable in the county in which such persons reside or the office of the company or corporation is located, shall return for taxation their stock of merchandise, raw materials, machinery, live stock, guano, commercial fertilizer, and all other personalty employed in the operation of such business enterprises, together with the manufactured goods and all other property of such business enterprises, and notes and accounts made and the money used in the prosecution of such business enterprises on hand at the time for the valuation of property for taxation, including all personalty of whatsoever kind connected with or used in such enterprises in any manner whatsoever, in the county in which is taxable the realty wherein such business enterprises are located or carried on: Provided, that the agent in this State of any person, firm, or corporation resident without this State, who shall have on hand and for sale, storage, or otherwise, as such agent, merchandise or other property, including money, notes, accounts, bonds, stocks, etc., shall return the same for taxation to the tax receiver of the county wherein the same may be situated, to be taxed for State and county purposes as other property in this State is taxed." The first portion of this section, that is the part preceding the proviso, merely determined situs as between counties of this State. The latter portion beginning with the word "provided" seems also to deal mainly with the question as between counties, declaring for the county "wherein the same [the property held by such agent] may be situated." While it does impose a duty upon an agent of a non-resident to return the property of his principal, including money, notes, and accounts, where he shall have them "on hand" in connection with a business conducted by him, it does not directly or by inference purport to re-

lieve the non-resident owner himself from the duty of making a return, as to any property that may be taxable in this State. As a matter of fact, there is nothing in the entire section relating to taxability, but the subjects dealt with are *returns*, where they shall be made, and who shall make them. See in this connection *County of Walton* v. *County of Morgan*, 120 *Ga.* 548 (48 S. E. 243). Other statutes (Code, §§ 92-101, 92-102, 92-105, supra) declare in effect that the kinds of property mentioned in this section shall be taxed in Georgia if within its jurisdiction, and manifestly the latter section was not intended to create an exception, or to exempt property of any kind that is otherwise taxable, merely because, if belonging to a non-resident, an agent does not have it "on hand" in this State.

We may say also, in this connection, that the intangibles-tax act of 1937 (Ga. L. Ex. Sess. 1937-8, p. 156), does not require a different conclusion. While section 3, paragraph (f), might authorize some deduction as to legislative construction of the tax laws now under consideration, yet in no view of this statute would it overturn these assessments made for previous years. *Park* v. *Candler*, 114 *Ga.* 466 (9) (40 S. E. 523). See also authorities cited in division 4, infra.

If any of the decisions by courts of other jurisdictions which have been cited for defendant in error should on proper analysis be construed to mean that choses in action arising *in the manner shown by the present record* could be taxed consistently with the fourteenth amendment only in the State of the owner's domicile, we could not accept them as sound, and should decline to follow them, especially in view of our own decision in *Armour Packing Co.* v. *Clark*, 124 *Ga.* 368 (supra), and decisions of the United States Supreme Court to which we have referred.

■ While it appears from the evidence that no loans were made during the period for which the tax was claimed, and that Durant, who was the exclusive Georgia agent, solicited no application after 1928, it is further apparent that the company did not withdraw from the field, but continued, through extensions and renewals, in the business which it had previously initiated, although for some reason it did not care for new loans. Whether it could have withdrawn so as to escape taxation as to any of the credits derived from such business and continuing in its ownership need not be de-

cided. It could not properly be said that these loans and the renewals did not constitute a course of business as distinguished from a single or occasional transaction as to which jurisdiction to tax might not exist.

It was stipulated in the record that before these and other assessments were made in 1937, against the credits of the North-western Mutual Life Insurance Company and other non-resident companies in like situation, no assessments had ever been made by any authority in Fulton County for ad valorem taxes against any non-resident insurance company or non-resident mortgage company owning credits secured by real estate in that county; also that before the making of these assessments no claim had been made by any of such authorities that these or other credits arising in a similar manner were subject to taxation in this State. It appeared also that the City of Atlanta had not imposed or attempted to impose an ad valorem tax on such credits, and that as far back as 1920, or earlier, the then city attorney gave an opinion to the effect that such credits were not subject to taxation by Atlanta. It is insisted that this administrative interpretation and practice, continued for a long period, should be accepted as controlling, especially in case of doubt.

We recognize the principle, and have not hesitated to apply it in proper cases, but, as a general rule, it may be used as an aid and considered by the courts only when the law is ambiguous and susceptible of different interpretations. Houghton *v.* Payne, 194 U. S. 88 (24 Sup. Ct. 590, 48 L. ed. 888) ; United States *v.* Missouri Pacific Railroad Co., 278 U. S. 269 (7) (49 Sup. Ct. 133, 78 L. ed. 322). The Georgia laws from which we have quoted are plain. They manifest beyond doubt an intention to levy a tax upon all property of every kind, and wherever located, of which the State has jurisdiction for that purpose; and thus, whatever interpretation the local authorities may have placed upon such constitutional and statutory provisions, it can not be accepted by this court in determining the question here presented. *State Revenue Commission* v. *National Biscuit Co.,* 179 *Ga.* 90 (2), 99 (175 S. E. 368) ; *Elder* v. *Home Building & Loan Association,* 188 *Ga.* 113 (2) (3 S. E. 2d, 75). Under the facts appearing, we are obliged to conclude that the credits were taxable as contended by

the defendants, and that the judge erred in finding the contrary and in granting relief accordingly.

■ Having reached the conclusion that the finding and decree were contrary to the evidence and without evidence to support them, and that a new trial should have been granted on the general grounds, it is unnecessary to pass upon the special grounds. It follows from what has been said that the court erred in overruling the motion for a new trial.

*Judgment reversed. All the Justices and Judges concur.*

BELL, Justice. I have been directed by the members of the court who are not presiding in this case to make a statement, in order that their positions may be understood by counsel.

We understand that Northwestern Mutual Life Insurance Company is a mutual insurance company, in which the holders of its life-insurance policies have a pecuniary interest. Chief Justice Reid and Justices Jenkins and Duckworth have life-insurance policies in this company. While Presiding Justice Atkinson does not hold a policy in this company, he is related by affinity within the prohibited degree to a policyholder.

It is of course well known to counsel that Justice Duckworth has disqualified himself in this and in similar tax cases, because of his official connection with these particular matters while serving as assistant attorney-general.

While all of these Justices presided in *Hirsch* v. *Northwestern Mutual Life Insurance Company*, 191 *Ga.* 524 (13 S. E. 2d, 165), in which this same company was a party, it did not occur to Judges Reid, Jenkins, or Duckworth that the fact that they held policies in this company, as they do, constituted ground for disqualification, and hence the fact that they held such policies was not thought of or mentioned.

The question of disqualification arose in the present case only by mere accident; and when it did arise, the Justices who held such policies, after careful consideration, considered themselves legally disqualified for this reason.

Judge Atkinson has consistently held it to be a ground of disqualification that a judge or justice holds a policy of life insurance in a mutual company, or is related within the prohibited degree to one who holds such a policy; or rather that has been his view since the decision in *State Mutual Life Insurance Company* v. *Walton*, 142 *Ga.* 765 (83 S. E. 656).

On discovery of the disqualifications for policy relationship, which was after the case had been submitted, it was then considered proper to notify counsel. Counsel agreed to waive the disqualification, and as to this the following may be said. It has also been the consistent policy of Judge Atkinson never to accept a waiver in any case if he is legally disqualified. He feels there is only one invariable rule to follow; and that is, not to preside, and such was his view in this instance.

Judge Reid intended to accept the waiver, but was out of the city at the time the final order on the subject was drawn, and through error or misunderstanding on the part of Judge Grice and myself, the only two Justices who were thought not disqualified, we designated a judge of the superior court to preside in his stead. We simply acted on a mistake as to Judge Reid's position, which of course we genuinely regret. However, after the order was passed, Judge Reid, deeming himself to be actually disqualified, considered that it would result in less confusion to let the matter pass as though he would decline the waiver, than to reopen it and displace the judge who had been designated in his stead.

The question whether a Justice is disqualified is one of law, and is governed by rules of law; while the question whether he will accept a waiver is one to be determined by him according to the particular circumstances existing at the time. Judge Jenkins, like Judge Reid, would ordinarily accept such waiver, but declined in this case, in order to be in line with what he thought was the conclusion of Judges Reid and Atkinson; Judge Duckworth having already held himself disqualified on other ground.

The fact that in this case Judges Reid and Jenkins are recorded as not accepting the waiver should not be considered as precedents as to either of them. Ordinarily in case of a disqualification of this kind, which they regard as being more technical than substantial, they would accept a waiver if offered; being governed, however, in each instance by the particular circumstances existing at the time, and relating to the propriety of their presiding in the particular case.

Judge Grice was not aware, and is not now aware, of any disqualification as to him; but in the last few days since this matter arose, one of his colleagues has suggested that a person to whom he is related within the prohibited degree probably does hold a policy

518

in this company. He knows of a number of persons who are near relatives of his, but it had never occurred to him to make inquiry of all these relatives, who are scattered throughout at least seventeen States of the Union, and some across the seas, in order to ascertain whether or not he is disqualified in every case in which a mutual insurance company is a party. If under the law he is actually disqualified in the instant case, he accepts the waiver thereof which has been tendered by counsel, deeming it proper as well as expedient for him to do so.

Nor do the other Justices or any of them consider it their duty to make such inquiry.

Judge Duckworth accepts the waiver so far as it applies to his relation as a policyholder, but could not preside because of his disqualification on other ground, which he regards as substantial.

In view of the situation as thus stated, it was deemed proper to have a reargument of the case, as only Bell of those who are finally to preside had heard the oral argument.