63580, 63581. CITY OF FITZGERALD v. NEWCOMER et al.; and vice versa.

CARLEY, Judge.

In 1914, the charter of the appellant-City of Fitzgerald (City) was amended to create the appellee-Water Light and Bond Commission of the City of Fitzgerald (Commission). The statute provided the Commission with the authority and power "to take charge of, operate and maintain the present system of water and lights in the City of Fitzgerald and improve the same . . . [P]rofits arising from the operation of said water and light plant and also all other public works under the control of said commission shall be paid monthly into the city treasury of Fitzgerald . . ." Ga. L. 1914, pp. 781, 809. In 1922 the City's charter was further amended to give the Commission the power and authority "to fix the rates to be charged consumers . . . [P]rovided, however, that the rates so fixed by said commission shall at all times be sufficient to provide the funds necessary for the operation and maintenance of . . . public works under their management and control, and shall also be sufficient to provide, in addition thereto, a surplus or profit of not less than ten (10%) per cent of the gross annual income derived from the operation of said . . . public works under their management and control, which surplus or profit and any additional surplus or profit over and above such minimum amount shall be paid into the treasury of the City of Fitzgerald." Ga. L. 1933, pp. 943, 945. In 1952, by amendment to the City's charter, the Commission was apparently first authorized to set aside and hold in a separate fund a portion of its net profits for future use. The statute giving the Commission this authority provided that

"[b]efore any such funds are set aside and held for future use, the said . . . commission shall first pay to the Treasurer of the City of Fitzgerald . . ., a sum equal to not less than ten (10%) percent of the gross annual income derived from the operations of the facilities, public works, or utilities under the management and control of said commission . . ." Ga. L. 1952, pp. 2014, 2023. In 1979, the City's charter was again amended and the Commission was again given the power and authority "to fix the rates to be charged consumers . . . and such rates shall also be sufficient to provide, . . ., a surplus or profit of not less than ten percent of the gross annual income derived from the operation of . . . public works under their management and control, which surplus or profit . . . shall be paid into the treasury of the City of Fitzgerald . . ." Ga. L. 1979, pp. 4469, 4472. The 1979 enactment left undisturbed the authority of the Commission to set aside a portion of its net profits for future use which had been granted in 1952.

The issue presented for resolution in the instant case is the meaning of the statutory phrase "gross annual income," the computational base from which the Commission's payment to the City is to be determined. It is the position of the Commission that "gross annual income" is a figure equal to its total receipts *less* the direct cost of energy purchased. In support of this construction, the Commission relies essentially upon the argument that it was the intention of both the City and itself that "gross annual income" be so construed and upon the fact that apparently at all times since at least the 1952 enactment which ended the City's entitlement to receive all the Commission's profits, payments have been made and accepted in an amount equal to ten percent of "gross annual income" as thus defined. The City, on the other hand, contends that it is entitled to receive ten percent of the Commission's "gross annual income" defined as total annual receipts without prior deduction for any expenses whatsoever.

The instant declaratory judgment action was instituted by the City against the Commission and its individual appellee-members to establish judicially the validity of the City's construction of "gross annual income" and its entitlement to ten percent of the Commission's total annual receipts. The Commission answered, raising estoppel as one of its defenses, and counterclaimed, asserting the validity of its construction of the phrase "gross annual income." The City's motion for summary judgment was denied as to a declaration of the validity of its construction of "gross annual income" but its motion was granted as to the Commission's estoppel defense. The City's petition for an interlocutory appeal to this court was granted and in Case Number 63580, the City appeals from the

denial of its motion for summary judgment. In Case Number 63581, the Commission cross-appeals from the grant to the City of summary judgment on the estoppel defense.

## Case No. 63580

1. "What is the proper construction to be given to a statute, . . . , is for the court and not for the jury. [Cit.]" *Crosby Aeromarine v. Hyde,* 115 Ga. App. 836, 841 (156 SE2d 106) (1967). Statutes are not contracts and it is the intent of the legislature and not of any other "party" which is decisive in their construction. See Code Ann. § 102-102 (9); *Stewart v. Atlanta Beef Co.,* 93 Ga. 12, 18 (2) (18 SE 981) (1893). "And it is well settled in this jurisdiction that all statutes are presumed to be enacted by the legislature with full knowledge of the existing condition of the law and with reference to it; that they are to be construed in connection and in harmony with the existing law; and that their meaning and effect will be determined in connection, not only with the common law and the Constitution, but also with reference to other statutes and the decisions of the courts. [Cit.]" *Spence v. Rowell,* 213 Ga. 145, 150 (97 SE2d 350) (1957). With these rules of statutory construction as our standard, we turn to the question of whether the trial court erroneously denied the City's motion for summary judgment in this declaratory judgment action.

" 'It is undoubtedly true that "profits" and "income" are sometimes used as synonymous terms; but, strictly speaking, "income" means that which comes in or is received from any business, or investment of capital, without reference to the outgoing expenditures; while "profits" generally mean the gain which is made upon any business or investment when both receipts and payments are taken into the account. . . .' " *Mundy v. Van Hoose,* 104 Ga. 292, 300 (30 SE 783) (1898). From 1914, when the Commission was first created, until 1952, when the Commission was apparently first authorized to retain a portion of its "net profits," the City was entitled to receive *all* of the profits of the Commission. Thus, during that time period the City was entitled to receive the entire "gain" made by the Commission. In 1933, the Commission was authorized and *required* to earn a "profit" of not less than 10% of its "gross annual income" and then to pay that amount to the City. It is readily apparent that if the amount to be paid to the City is denominated as the Commission's "profit," then "gross annual income," a percentage of which is mandated as the amount of the profit, must mean the total annual "receipts" of the Commission. See *Mundy,* 104 Ga. at 300, supra. This is true because, as noted above, "profit" is the "excess of *value received* for producing, keeping or selling, over cost." (Emphasis supplied.) *Mundy,* 104 Ga. at 299, supra. Thus, where

"profit" is expressed as a percentage of "income," especially "gross income," it is an amount equal to the stated percentage of the total "value received" before deductions for cost. Therefore a "profit" of 10% of "gross income" means 10% of the total "value received" before the cost of producing that "value received" has been deducted. It follows that under the 1933 and subsequent statutes, it is an amount equal to at least 10% of the total annual "value received" by the Commission which the statutes require it to earn and pay to the City, not an amount equal to only 10% of the "value received" remaining after deduction for the costs of producing that value. The latter amount would be 10% of "profit," not a profit of 10%. In other words, the Commission is required by law to set its rates so that, *after* deduction for expenses, at least 10% of its total annual revenues will remain as "profit" and to pay this amount to the City. A minimum of 10% of the Commission's "gross annual income" is, to the extent that the statutes require that amount to be furnished to the City, a statutorily fixed "expense" for the Commission.

The act of 1952 in no way altered or changed the Commission's obligations and the City's rights with regard to the required amount of payment by the former to the latter. It is clear that the 1952 statute granted the Commission the authority, which it had not previously possessed, to set aside a portion of its "net profits" for future use. However, in giving the Commission this authority the legislature made the exercise of it "subject to the conditions, limitations and restrictions [t]hereinafter set out..." Ga. L. 1952, pp. 2014, 2023. The conditions, limitations and restrictions on the Commission's authority in this regard establish a priority for the distribution of the Commission's revenues. The statute provides that, "[b]efore any such funds are set aside and held for future use," the City must first be paid a sum equal to not less than 10% of the Commission's gross annual income, the necessary funds for the operation and maintenance of and repairs to facilities must have been expended and a "portion of such gross income . . . , not exceeding twelve per cent (12%)" must have been expended for the purpose of "providing for extensions or additions to and improvements of the existing facilities or utilities..." Ga. L. 1952, pp. 2014, 2023. The statute then provides that "[a]fter having made the payments and provided for the operation, maintenance, repairs, extensions and improvements as aforesaid, the said ... commission, ..., shall have ... the right, power and authority to set aside and hold in a separate fund, . . . such proportion of the net profits then remaining in its hands and derived from the operation of such facilities or utilities as it may deem necessary and proper, but in no event to exceed one-half of such net profit, the remaining one-half of such net profit to be paid to the

treasurer of said city for use in its general funds." Ga. L. 1952, pp. 2014, 2023.

It is clear that in authorizing the setting aside of a portion of the Commission's "net profits," the statute otherwise provides for the priority of disbursement of the Commission's available funds. Thus, the Commission has "net profits" over which it has authority pursuant to the 1952 statute only to the extent that: (1) It has first satisfied its obligation to the City, which, as we have demonstrated above, means that the Commission's "profit" in an amount equal to 10% of its total receipts is paid; (2) It has provided for the funds necessary for the operation, maintenance and repairs of existing facilities; and (3) It has provided for the expenditure of not more than 12% of its gross income for the extension or addition to and improvement of existing facilities. Only after these three "conditions, limitations and restrictions" establishing and setting a priority for the disbursement of "gross annual income" are met, does the Commission have authority and power over up to one-half of the "net profit" remaining, the other one-half of "net profit" being owed to the City. See generally *Stokes v. Walker,* 21 Ga. App. 630 (1) (94 SE 841) (1917). If there is no "income" in the hands of the Commission after these statutorily established "claims" against that income are accounted for, there are no "net profits," within the meaning of the 1952 statute, remaining. Thus, the 1952 enactment does not change in any way the City's entitlement to its minimum payment from the Commission's "profits" of an amount equal to 10% of its total revenues for the year. If anything, the 1952 statute establishes that the City's entitlement to that amount has priority over the commission's right to use its "net profit" to expand its own business.

For the reasons discussed above, the trial court erred in failing to grant the City's motion for summary judgment as to the construction of "gross annual income" contained in the relevant statutes.

2. Remaining enumerations of error not otherwise specifically addressed have been subsumed into or have been rendered moot by Division 1 of this opinion.

### Case No. 63581

3. It is urged that the City should be estopped from asserting the construction of "gross annual income" which we have found in Division 1 to be valid. This argument amounts to no more than an assertion that the City should be estopped to seek a judicial construction of the relevant statutes because the City has in the past either acquiesced in the Commission's construction of the statutory phrase or has tacitly agreed that that construction is correct. As has already been noted, the construction of statutes is ultimately a

question for the courts, not the "parties." See *Elder v. Home Building &c. Assn.,* 188 Ga. 113 (2) (3 SE2d 75) (1939). "The Georgia laws from which we have quoted are plain . . . [T]hus, whatever interpretation the local authorities may have placed upon such . . . provisions, it can not be accepted by this court in determining the question here presented. [Cits.]" *Suttles v. Northwestern Mut. Life Ins. Co.,* 193 Ga. 495, 515 (19 SE2d 396) (1942). See also *State Revenue Comm. v. Nat. Biscuit Co.,* 179 Ga. 90, 100 (175 SE 368) (1934). "Whether there has been a custom subsequent to the passage of the [relevant statutes], which was promoted or acquiesced in by the people of the City of [Fitzgerald], . . ., can not be heard in a court of law to support a violation of the law, when the attention of the court is called to the violation of a positive statute of the General Assembly, which has the right not only to amend municipal charters but even to withdraw the charter entirely. [Cit.]" *Chapman v. Walden,* 183 Ga. 395, 398 (188 SE 885) (1936). See also *Blue Ridge Tel. Co. v. City of Blue Ridge,* 161 Ga. App. 452 (288 SE2d 705) (1982). Accordingly the trial court did not err in granting the City summary judgment as to the Commission's estoppel defense.

*Judgment reversed in Case No. 63580; affirmed in Case No. 63581. Quillian, C. J., and Shulman, P. J., concur.*

DECIDED MAY 26, 1982 —
REHEARINGS DENIED JUNE 21, 1982 — ▮▮▮▮▮▮▮

*Buckner F. Melton, E. S. Sell, Jr., Richard B. Miller,* for appellant.
*W. Emory Walters, Ben B. Mills, Jr., G. Conley Ingram, Robert D. McCallam, Jr.,* for appellees.